# WELLSVILLE EAST FIELD IRR. CO. et al. v. LINDSAY LAND & LIVESTOCK CO. et al.

No. 6404. Decided May 14, 1943. (137 P. 2d 634.)

450

See 31 C. J. S., Estoppel, sec. 59; 27 R. C. L. 1290.

452

For opinion on rehearing see 104 Utah 498.

*Thatcher & Young,* of Ogden, for appellants.

*J. D. Skeen,* of Salt Lake City, and *Young & Bullen,* of Logan, for respondents.

WOLFE, Chief Justice.

This started as a suit in equity, brought by the plaintiff irrigation companies to enforce a previous decree of the District Court of Cache County in a case entitled *Utah Power and Light Co.* v. *Richmond Irrigation Company.* That decree, commonly known as the Kimball Decree, was entered February 21, 1922. It purported to be a general adjudication of all water rights in Little Bear River. However, some of the defendants in the present suit were not bound by the Kimball Decree because neither they nor their predecessors were made parties to it. The plaintiffs base their claims entirely upon the Kimbal Decree and pray that the defendants, and each of them, be enjoined from claiming or asserting any rights to the use of water of Little Bear River or from diverting or otherwise interfering with the flow of any water from said river beyond or in excess of the rights specifically decreed to each of them by the court in the Kimball Decree.

At the outset each defendant entered a plea in abatement on the theory that the suit called for a general adjudication of water rights and that, therefore, by virtue of Sec. 100-4-3,

R. S. U. 1933 as amended by Chap. 112, Session Laws of 1939, the court had no jurisdiction to proceed except as prescribed by that statute. It is admitted that the prescribed statutory procedure for a general adjudication was not followed. In this proceeding were a general statutory adjudication of water rights it would have been error for the trial court to refuse to abate the proceedings and refer them to the State Engineer as prescribed by statute. However, this court recognized in the case of *Spanish Fork West Field Irr. Co.* v. *District Court,* 99 Utah 558, 110 P. 2d 344, that all suits involving water rights were not necessarily general adjudications. When a "private suit" was brought we held that it was not necessary for the court to force it through the statutory procedure for a general adjudication. We do not think this action had the comprehensiveness of a suit to adjudicate all the water of a system. It was originally a private suit to determine the relative rights of these defendants as against these plaintiffs and at least for the purposes of this decision we treat it as such without thought of laying down any line at which a so-called private suit may in reality become or take on the aspects of a general adjudication.

The trial court, after hearing the evidence, found against the defendants on all issues raised and enjoined them from using the water. It then superimposed on its judgment, which it called an Interlocutory Judgment, an order that the suit be converted into a general adjudication of the Little Bear System under the provisions of Chapter 4 of Title 100, R. S. U. 1933. Each of the defendants appealed. The propriety of this latter action is not before us.

At the trial the plaintiffs proceeded upon the theory that all of the defendants in their separate answers had set up claims adverse to the Kimball Decree. So after offering the Kimball Decree in evidence, they rested. Because of the different bases for the defenses urged by the different defendants and the relatively large number of claims involved, it will be necessary to set out each claim separately for this is in reality five suits in one.

As to Defendant Lindsay Land and Livestock Co.

We first consider the defense and the evidence in support thereof urged by defendant Lindsay Land and Livestock Co. This defendant by its separate answer asserted two distinct claims to the use of water from Little Bear River. First, a right decreed to it by the Kimball Decree to 1 c. f. s. with a priority date of May 1, 1890. This right was affirmed by the trial court. It is not involved in this appeal and no further mention need be made of it. The second claim asserts the right to divert water from two points on Davenport Creek, a tributary to Little Bear River. This second claim is based on adverse user, abandonment, and statutory forfeiture for failure of the prior owner to use for five years, supported by a filing with the State Engineer for appropriation of 2 c. f. s. of water with a priority date of November 17, 1939, which application is in good standing with the office of the State Engineer.

The evidence in support of this claim shows that George Nichols, the predecessor in interest to this claim was a defendant in the Kimball Decree. He, an old man at the time, appeared, told the clerk he had answered as required by the summons, and then left without making further appearance or filing an answer in the cause. As a result of his failure to make a proper appearance, a default judgment was entered against him and he was awarded no rights to the water from Little Bear River. Nevertheless he continued to use the water just as he had used it before the decree. His testimony was that he had used the water continuously for over 52 years. Some ten other witnesses all of whom were well acquainted with the Nichols land testified that Nichols and his sons had used this water each and every year since the Kimball Decree in 1922. The land was watered as much as six times after the high water season. This evidence is positive and is for the most part uncontradicted.

The deposition of Orson M. Wilson, former president of the Hyrum Irrigation Co., was introduced and read into the record by the plaintiffs. Wilson testified that it was

common knowledge that Nichols was using the water under claim of right even though he had not been awarded any water by the Kimball Decree. Wilson further testified that he talked with Nichols in the summer of 1926; that at that time Nichols was irrigating his land with the water in question; that he told Nichols that he, Nichols, had no rights under the decree; and that Nichols indicated that he had a right to use the water anyway. Wilson could not remember whether he had the water turned off at that time or not. He did not go up to the Nichols property again that season although he knew that Nichols would continue to use the water. He stated that he recognized that a mistake had been made by Nichols' failure to "prove up" in the Kimball suit but stated that the plaintiffs intended to stick to their rights under the decree. He further stated that whenever the plaintiffs discovered that Nichols had water on his land they would turn the stream off. However, when asked: "You as an old citizen here recognized that notwithstanding a mistake had been made, he [Nichols] had some rights here, didn't you"; he answered: "Well I won't say." "I won't answer that."

We must conclude from this evidence that Nichols with the knowledge of the irrigation companies' officials openly ignored the Kimball Decree and under a claim of right used the water each and every year just as he had used it before the decree was entered.

But was such adverse use uninterrupted as meant by the law? Plaintiffs' witnesses testified that they turned the water off whenever they discovered that Nichols was using it. On several occasions they told Nichols to quit using the water. Nichols himself admitted that one Frank Price turned the water off once about 25 years before the date of the suit and that several years later one Leishman turned it off once. Other witnesses for the plaintiffs testified that they turned the water off in 1923, 1924, 1926, 1927, 1933 and quite regularly from then until the date of the suit.

Defendant Lindsay Land succeeded to the Nichols rights in 1939 by purchase. It filed an application to appropriate 2 c. f. s. of water with a priority date of November 17, 1939, and the application was approved on the theory that the plaintiffs had forfeited their rights to this water by their failure to use it for over five years. Lindsay Land admits that Nichols was bound by the Kimball Decree and that he was awarded no rights by it, but asserts, along with other defenses, that the above facts show title by adverse user.

The writer of this opinion has previously expressed considerable doubt as to whether title in an intangible like a water right could be acquired by adverse possession. See discussion in dissenting opinion in *Hammond* v. *Johnson*, 94 Utah 35, 75 P. 2d 164. But regardless of the view there expressed on this subject, the law is well settled in this jurisdiction, that at least under our statutes prior to 1903, when the provisions providing for the exclusive method of appropriating water were adopted, title could be acquired by adverse user. *Ephraim Willow Creek Irr. Co.* v. *Olson*, 70 Utah 95, 258 P. 216; *Smith* v. *North Canyon Water Co.*, 16 Utah 194, 52 P. 283; *Spring Creek Irr. Co.* v. *Zollinger*, 58 Utah 90, 197 P. 737.

However, in *Clark* v. *North Cottonwood Irr. & Water Co.*, 79 Utah 425, 11 P. 2d 300, 304, we stated:

"It may be a debatable question whether title to a water right may be acquired since the enactment of Laws of Utah 1903, Chap. 100, by adverse use or after it has been abandoned by a prior appropriator without a filing in the office of the state engineer, as provided by law. *Deseret Live Stock Co.* v. *Hooppiania*, 66 Utah 25, 239 P. 479. This case does not require a decision of that question, and we do not express any opinion concerning the same."

Subsequently, still more doubt was thrown on the question by two later decisions. In *Hammond* v. *Johnson*, 94 Utah 20, 66 P. 2d 894, 900, this court, after discussing various early cases and the statutes relating to the appropriation of water by filing with the State Engineer, stated:

"One may obtain rights to the use of public waters by appropriation or may obtain private rights to the use of water by purchase, lease, or grant in recognition of the owner's title, or in derogation and defiance of the owner's title by disseisin of the owner and use and possession of the right for the statutory time, commonly called 'adverse possession.' * * *

"It follows, therefore, that notwithstanding the statute of appropriation, as between private claimants, water rights in Utah can be acquired by adverse user and possession."

This definite holding would have settled this matter had the case ended here, but it did not. The State Engineer, who was not a party in the Hammond suit, filed a brief in support of a petition for rehearing urging that under the statutes in force between 1903 and 1939 a water right, after 5 years of continuous nonuse by the appropriator, reverts to the public and can be reappropriated only upon application to the State. The court, in denying rehearing, stated that this was an action to quiet title and affected no one but the parties and those claiming through them; it thus purported to leave open the question as to whether or not title had reverted to the public. However, we held that as between the prior owner and the adverser, the adverser could after seven years of open, notorious, etc., possession, have his title quieted as against the prior owner. Hence, we must have held that the adverser got something. If after five years of nonuse title reverted to the public, neither the adverser nor the prior owner would have any title. Their lack of title would be equal. If neither had any title, neither should be able to quiet title against the other. By holding that the adverser had a superior title to that of the prior owner, we necessarily held that he got something by virtue of the seven years of adverse use and that title did not revert to the public after five years of adverse use.

This same question arose in *Adams* v. *Portage Irr., Reservoir & Power Co.*, 95 Utah 1, 72 P. 2d 648, and again in the original opinion this court stated that title could be acquired by adverse possession. On petition for rehearing the State Engineer again filed a brief contending that the state's

rights were prejudiced by the opinion. Again in denying the petition for rehearing (95 Utah 20, 81 P. 2d 368), the opinion was limited so as to leave open the question of whether title could be acquired by adverse possession.

Both of the denials of petitions for rehearing were by three-two decisions. The dissenting justices felt that the whole question of adverse user in relation to water rights should have been reopened and not left in its existing state of uncertainty. Subsequently, at the 1939 session, (see Laws of Utah 1939, ch. 111), the legislature adopted amendments designed to prevent the acquisition of a right to water already appropriated by another, solely by adverse user. Thus the question as to whether title could be acquired by adverse user during that period between 1903 and 1939 is still left in a state of uncertainty.

The case of *Deseret Live Stock Co.* v. *Hooppiania,* supra, did not determine this question. The opinion held only that water, the *title to which was in the public* either because of actual abandonment or statutory forfeiture, could only be reappropriated by following the procedure prescribed by statute. The court stated that the evidence was conclusive that neither the appellant nor its predecessor in interest had put any of the water involved, except two small springs, to a beneficial use between 1910 and 1918. Hooppiania, the respondent, apparently first diverted the water in March of 1918. Both appellant and respondent filed on the water a short time thereafter; the appellant in April and the respondent in May. The court held that this diversion by Hooppiania in March not accompanied at that time with a filing with the State Engineer did not constitute an appropriation which would take precedence over the April filing of the appellant. Under this holding it can no longer be doubted that once title to water has reverted to the public, it can be reappropriated only by following the statutory procedure. But it does not determine the question as to whether title reverts to the public after five years of adverse use.

The question as to whether title to water can still be acquired by adverse user is inseparable from the question of

statutory forfeiture. As stated by Hutchins, Selected Problems in the Law of Water Rights, p. 400:

"The one who substantiates a claim of adverse use takes over the rights which the other party can assert at the end of the prescriptive period, as the Utah court states [in Hammond v. Johnson], but only those rights. If, then, the prescriptive period is 7 years and the statutory period of ferfeiture for nonuse is 5 years, as is now the case in Utah, the water reverts to the public at the end of the 5 years and the former appropriator thereafter has nothing for the adverse user to take—unless the court should hold, as several courts have held (see p. 396), that loss of the right does not result from unlawful diversion by another. Should it be held * * * that forfeiture of the water right follows nonuse, regardless of the reasons therefor, then the right of the adverse user could not be based upon adverse use, for the water has become public water before the expiration of the prescriptive period."

The logic of the proposition that the right of the adverse user could not be based on adverse possession if we were to hold that statutory forfeiture follows nonuse by the appropriator regardless of the reason therefor is unanswerable. Therefore, if we were to hold that nonuse resulting from an unlawful diversion by another would work a statutory forfeiture, we logically would be compelled to hold that title could not be acquired by adverse possession. The converse of this is also true; that is, if title can be acquired by adverse use, then title does not revert to the public after five or more years of adverse use. This would be the result of such a holding as to a right vesting prior to 1939 when section 100-1-4 was amended to read that "the provisions of this section are applicable whether such unused or abandoned water is permitted to run to waste or is used by others without right."

We therefore examine the Utah statutes on statutory forfeiture to determine whether or not adverse user will work a statutory forfeiture. The first forfeiture statute was adopted in 1880. Chap. 20, sec. 9, Laws of Utah 1880. That statute provided:

"A continuous neglect to keep in repair any means of diverting, or conveying water, or a continuous failure to use any water, for a period of seven years at any time after the passage of this Act, shall be held to be an abandonment and forfeiture of such right."

Section 6 of the same chapter provided:

"Whenever any person or persons shall have had the open, peaceable, uninterrupted, and continuous use of water for a period of seven years"

a right to the use of said water for any useful purpose shall be recognized and acknowledged to have vested and accrued as a primary right.

The only possible way that these two sections of the same chapter can be construed together is that forfeiture to the public did not occur as long as an appropriator or an adverse user was using the water. In other words by the express wording of the statute a title could be acquired by seven years of open, peaceable, uninterrupted and continuous use. Before such a use by an adverse user could ever occur the appropriator would have to cease to use the water for a like period, that is, for seven years. Thus failure to use the water for seven years by virtue of section 9 would work a forfeiture to the public of the water right, but section 6 provides that title, under this situation, shall go to the adverser. Therefore, at least while these two sections were in existence side by side, we must conclude that non-use resulting from an unlawful diversion by another would not work a statutory forfeiture.

Section 6 of Chapter 20, Laws of Utah 1880, dealt with the various methods for appropriating water at that time. When the State began to exercise more control over public or unappropriated water, section 6 was dropped out and new provisions for appropriating water were enacted. Hence, after 1897 the portion of section 6 quoted above relating to acquiring title by seven years of peaceable, open, etc., possession was dropped from the statutes and does not subsequently appear. In 1903 the provision relating to statutory forfeiture was amended to read:

"When an appropriator or his successor in interest abandons or ceases to use water for a period of five years the right shall cease and thereupon such water reverts to the public * * *."

This section was examined in *Hammond* v. *Johnson,* supra, and the court held it did not apply to a case where the failure to use was caused by the unlawful diversion by another. While, as noted above, the court purported to limit the effect of this opinion by the decision on petition for rehearing, it did quiet title in the adverser. Implicit in the holding that title could be quieted in the adverser is the holding that title did not revert to the public after seven years of adverse use.

It is important to water titles in this State that this matter be settled and it should be settled so as to cause as little disturbance in water titles as possible. Any person who has failed to use his water for seven years has either forfeited it to the public or lost title to some adverse user. Not only has he lost title, but he has not been using the water and will not be seriously injured if he is told that he cannot use it in the future. On the other hand, because of the confusion in the law of this State heretofore, there may be many individuals who, in reliance on a title acquired by adverse possession, have built homes and made other improvements on their lands. They are at the present time using the water and would be seriously injured if we were to hold that title to their water had reverted to the public. Even though title were to revert to the public, it is unlikely that it would be available for appropriation by filing with the State Engineer for on practically every stream in this State there are junior appropriators whose applications have been approved by the State Engineer for a total of more water than ordinarily is available in the stream. The reversion of this water would then go to feed these rights of the junior appropriators. The net result of a holding that forfeiture resulted after five years of adverse use would be to have the water revert to the junior appro-

priators to feed their rights. The case of *Hammond* v. *John-son,* supra, held that the forfeiture statutes prior to 1939 did not apply to a case where the failure to use was the result of an unlawful diversion by another, and that title can, therefore, be acquired by adverse user. We think that this attains a desirable result and conclude that title could between 1903 and 1939 be acquired by adverse possession. Implicit in this holding is the holding that adverse use will not work a statutory forfeiture.

We thus turn to a determination of the question whether in this case Lindsay Land and Livestock Company or its predecessor, Nichols, acquired title by adverse possession. It is well established that the person asserting title by adverse user has the burden of proving it. The cases generally hold that there is a presumption against such acquisition of title. *Smith* v. *North Canyon Water Co.,* supra; *Spring Creek Irr. Co.* v. *Zollinger,* supra; *Ephraim Willow Creek Irr. Co.* v. *Olson,* supra; Weil, Water Rights in Western States, 3rd Ed. Vol. 1, § 579. In *Smith* v. *North Canyon Water Co.,* 16 Utah 194, 52 P. 286, we stated that

"The right of the defendant in the water would become fixed only after seven years' continuous, uninterrupted, hostile, notorious, adverse enjoyment; and, to have been adverse, it must have been asserted under the claim of title, with the knowledge and and acquiescence of the person having the prior right, and must have been uninterrupted."

We quoted this same language with approval in *Hammond* v. *Johnson,* supra.

The evidence set out above relating to the claim of Lindsay Land shows that it and its predecessor, Nichols, used the water each year from 1922 until the date of suit in 1940 to make their crops; that the use was open, notorious, and under a claim of right adverse to the rights of the plaintiffs. The fact that his use was frequently interrupted is ample evidence to show the adverse nature of this claim. *Hammond* v. *Johnson,* supra. This use under claim

of right was common knowledge among the plaintiff officials. In regards to the elements necessary to prove adverse user at least to this point, the court is in agreement. However, on the question of interruption we disagree and what is to follow in regards to the claim of Lindsay Land represents a minority opinion as to that claim. The writer of this opinion believes that there is sufficient evidence to show an interruption in the use and Mr. Justice McDONOUGH concurs with this view. However, the majority of the court in an opinion written by Mr. Justice LARSON holds to the contrary.

It should at the outset be noted that this writer does not contend that the adverser must keep a continuous flow of water running on his land in order to establish a prescriptive right. Water is ordinarily used intermittently according to need. And we agree that an adverser may establish a right to use the water intermittently according to definite periods or according to need. But we are unable to agree with the view expressed by Mr. Justice LARSON on the question of interruption.

In determining whether or not there has been a sufficient interruption of the use to prevent the acquisition of title by adverse user, the circumstances under which the flow of the water is interrupted must be examined. It is almost uniformly held that a clandestine or secret interruption would not be sufficient. *Brattain* v. *Conn*, 50 Or. 156, 91 P. 458. Nor would mere words alone suffice. *Hammond* v. *Johnson*, supra. But the authorities hold that an interruption once during the entire prescriptive period is sufficient to prevent the acquisition of title by adverse user if such interruption is made under such circumstances as to reassert ownership of the water rights. *Authers* v. *Bryant*, 22 Nev. 242, 38 P. 439; *Trenton Water Power Co.* v. *Raff*, 36 N. J. L. 335. Generally the same elements must be present to constitute an interruption as would be required to start the running of the prescriptive period, that is, the interruption must be open, notorious and under claim of right, and it

must be adverse to the claim of the adverse user. *Armstrong* v. *Payne,* 188 Cal. 585, 206 P. 638. But the owner's actions to effect an interruption need not be of greater dignity than those required by the adverser to initiate the right. When the flow is stopped under these circumstances it constitutes an interruption even though the flow is stopped for a relatively short time. It is the circumstances surrounding the interruption rather than the length of time the flow is shut off. In *Smith* v. *North Canyon Water Co.,* 16 Utah 194, 52 P. 283, we held that there was an interruption when the facts showed that the owner took the water from the adverse claimant and used it on his land. The adverser was not aware that the owner was taking the water at the time but as soon as he discovered that the owner had taken it, he took it back. We pointed out that the act of taking the water and the use thereof was a sufficient assertion of ownership to preclude a presumption of abandonment or to allow acquisition of title by adverse user.

It should be noted in the Smith Case that the adverse claimant did not know that the owner was taking the water at the time the owner took it, but the taking was open and notorious. As stated in Weil, Water Rights in Western States, 3rd Ed. Vol. 1, § 585:

"Since the rules of adverse use are punitive, to induce watchfulness, the better view seems to be that it is sufficient if the adverse use was open and without attempt at concealment."

We so held in *Utah Power & Light Co.* v. *Richmond Irr. Co.,* 79 Utah 602, 12 P. 2d 357. By the same token, an interruption should be sufficient if the water is turned off under the same circumstances, that is, openly, notoriously under claim of right, and with no attempt at concealment. *Armstrong* v. *Payne,* supra.

In *Authers* v. *Bryant,* 22 Nev. 242, 38 P. 439, the court held that turning the water out of the claimant's ditch once during the entire prescriptive period was a sufficient interruption even though the adverser turned it back into the

ditch as soon as the owner left. The facts showed that the adverser had the water running on his land to water some trees. Certainly the inference was that he was exercising his claimed right to use the water for the trees rather than that he had no more use for the water but was permitting it to run to waste. The owner does not have to prove a negative, to wit: that the adverser had not finished his claimed use of the water. The inference when the adverser is permitting the water to run on his land is that he is doing it in pursuance of his claimed adverse use unless it appears definitely that the interruption was at a time after his claimed tour of use was through. Where there is no definite tour claimed but the claim of the adverser is that he can use it any time he needs or desires it, as in the instant case, the inference is especially strong that when it was running on his land he was using it in exercise of that claimed right. The burden should be on him to prove that the interruptions were at times when he was through with its use but had neglected to turn it back.

See, also, *In re Water Rights of Ahtanum Creek*, 139 Wash. 84, 245 P. 758; *Hall* v. *Webb*, 66 Cal. App. 416, 226 P. 403; *Armstrong* v. *Payne*, supra; *Trenton Water Power Co.* v. *Raff*, 36 N. J. L. 335. In *Morris* v. *Bean*, 146 F. 423, the court pointed out that the prescriptive period will never run on a "scrambling possession."

In the case of *Armstrong* v. *Payne*, supra [188 Cal. 585, 206 P. 643], the court stated that:

"It is clear that in order to interrupt the running of the statute of limitations, as to flowing water, there must be a resumption of the possession thereof under a claim of right brought home to the adverse claimant either by express notice * * * or *by conduct so notorious and unequivocal as to imply such Notice. In other words, the interruption of the possession must rise in dignity and character to that required to initiate an adverse possession.*" (Italics added.)

This opinion does not, as Mr. Justice LARSON states, "lay down the rule that a mere showing that the water had once been turned out of the ditch of the adverse user tolled

the running of the seven-year period." But from these authorities we can conclude that (1) there must be an actual physical interruption—mere words alone will not suffice; (2) a single interruption will suffice even though the owner knows that the adverser will turn the water back into his ditch as soon as the owner leaves; (3) the interruption must rise in dignity and character to that required to initiate an adverse possession, that is, it must be open, notorious, under claim of right, and there must be no attempt at concealment. However, the adverser need not, as Mr. Justice LARSON seems to hold, have express or actual knowledge of the interruption. It is sufficient if he has ready means of knowledge and that no effort is made to conceal the stoppage of the flow; and it must (4) be under such circumstances as to constitute a reassertion of ownership under a claim of right. It should, after all, be kept in mind that the adverser has nothing until the full prescriptive period has run. He is merely in the process of acquiring title by the use without right of another's water. When the owner takes the water, i. e., physically interrupts the flow of the water, at a time when it is on the adverser's land, and does so openly and under claim of right it is sufficient interruption. The owner may, if he interrupts in the manner stated, do so even with no knowledge that any one is in the process of adversing him for after all he is simply using what is his own property or he may interrupt with the actual intent of preventing the adverser from gaining title.

In the instant case, the testimony is that the water was actually turned out of Nichols' ditch and that Nichols on various occasions was told to quit using the water. The water was turned out of his ditch at least once every seven years. There was no attempt at concealment; it was open and notorious and under claim of right by the record owner. While Nichols was not present when the water was turned off, the testimony shows that the plaintiffs looked for Nichols and could not find him. From the numerous discussions concerning the ownership of the water and the

fact that it was shut off, Nichols certainly had at least means of knowledge of the fact that the plaintiffs were turning it off. The evidence shows that Nichols used the water when he saw fit—that he did not take a regular turn. Hence, the evidence does not show affirmatively that the water was turned off during a period when Nichols claimed the right to use it. But in every case the water was running in the Nichols ditch and the fair inference from this is that it was running on his land. And while there is no direct evidence to show that at the time the water was shut off Nichols was not through with it and would not have acquiesced in such interruption, certainly the fair inference to be drawn from the fact that the water was running on his land is that he wanted to use the water. Admittedly, the fact that Nichols did not claim a regular turn makes it difficult for the plaintiffs to show that they interrupted his use of the water at a time when he wanted to use it, but certainly the fact that the water was running on his land should give rise to a sufficient inference that it was running there because he wanted it to so run and that the interruption of the flow of the stream interrupted his use. The fact that he took sufficient water to make his crop each year would make no difference for there was at least one physical interruption of his use every seven years under such circumstances as to reassert ownership. The use of this water was sufficiently interrupted to prevent acquisition of title by adverse user.

The defense asserted by Lindsay Land that there has been a statutory forfeiture has already been disposed of by our holding that title can be acquired by adverse possession. The defense that there has been an abandonment must also fail. Abandonment is a separate and distinct concept from that of forfeiture. As stated in *Hammond* v. *Johnson,* supra,

"Forfeiture for nonuser during the statutory time may occur despite a specific intent not to surrender the right. It is based, not upon an act done, or an intent had, but upon a failure to use the right for the

statutory time. 'While upon the one hand, abandonment is the relinquishment of the right by the owner with the intention to forsake and desert it, forfeiture upon the other hand, is the involuntary or forced loss of the right, caused by the failure of the appropriator or owner to do or perform some act required by the statute. * * * ' 2 Kinney on Irr. and Water Rights (2d Ed.) p. 2020, § 1118."

If there were an abandonment or a statutory forfeiture, Lindsay Land should succeed as against these plaintiffs for it has made a subsequent appropriation by filing with the State Engineer. However, this filing which was made on November 17, 1939, would ordinarily be junior to existing rights of other claimants. See Hutchins, Selected Problems in the Law of Water Rights in the West, p. 402. The burden is on the person asserting abandonment to prove it. Here there is no evidence to show an intent to abandon. In fact, the evidence almost conclusively shows just the contrary. We must conclude that the plaintiffs did not abandon their rights to this water and this defense must fall.

To summarize the position of the defendant Lindsay Land: The rights claimed must have come into being since the entry of the Kimball Decree in 1922 for Lindsay Land and its predecessor was bound by that decree. The claim of abandonment fails because no showing of an actual intent to abandon is made; the claim based on statutory forfeiture fails because of our holding that "nonuse" under the statute is not made out by showing adverse use. The majority of the court holds that the evidence is sufficient to show acquisition of title by adverse use, but the writer of this opinion dissents from this view on the theory that there is no showing of seven years of *uninterrupted* use by Lindsay Land or by Nichols.

### Defendants Summers, Pulsifer, and Nuhn

Defendants Summers, Pulsifer, and Nuhn were all bound by the Kimball Decree by reason of the fact that their predecessor in interest, Wm. Pulsifer, Sr., was a party defend-

ant in the Kimball suit. These defendants filed a joint answer in which they alleged the right to divert water directly from Little Bear River at a point some 100 yards below the point where the Hyrum Dam diverted water from Little Bear River into the Hyrum Canal. This point of diversion below the dam is commonly known as the "lower ditch." It has been used to irrigate these same lands for well over 50 years. However, the Kimball Decree did not award any rights to Wm. Pulsifer in regards to this lower ditch. Therefore, the rights of these three defendants must start at a date subsequent to the entry of the Kimball Decree in 1922. Their defenses are (a) valid appropriation; (b) nonuser by plaintiffs for more than 5 years, i. e., statutory forfeiture by the plaintiffs; (c) abandonment by plaintiffs; (d) adverse user; (e) estoppel of Hyrum Irrigation Co. to deny defendants water after so long a use as ostensible stockholders; (f) general estoppel on equitable grounds.

The further evidence relating to these defenses shows that soon after the entry of the Kimball Decree a relatively tight dam was placed across the Little Bear River. There was a small amount of seepage through this dam at times, but substantially all of the water was diverted into the Hyrum Canal by this dam. These defendants secured water by placing a rock under a flash board on this dam and letting sufficient water run through the dam to water their lands. They watered their lands with this water from 1926 until the date of suit. The water which was in this manner let run through the dam was diverted from Little Bear in the defendants' lower ditch. The head of this lower ditch was concealed in brush and willows. Plaintiffs testified that they did not know of this ditch until 1934 and there is evidence to show that plaintiffs have regularly interrupted the diversion of water through their dam from 1934 until the date of suit. Prior to 1934 plaintiffs testified that they replaced the flash boards whenever they noticed that the boards had been disturbed for they thought the water was merely running to waste. The evidence conclusively shows

that these defendants have raised crops each and every year on their lands by the use of this water which they let through the plaintiff's dam, that the land would not grow crops unless irrigated, that plaintiffs regularly passed these lands and could easily have seen that they were being irrigated. Summers' land was closer to the dam than was the land of Pulsifer and Nuhn. Summers was a stockholder in the plaintiff companies but it does not appear that he could have made his crops from the use of this water stock. But all the land was clearly visible from either the dam or the highway. Summers testified that the flow of the water through the dam obtained from raising the flash boards was interrupted possibly 12 times from 1926 until the date of the suit. The exact or approximate dates of these interruptions were not given.

In the light of this evidence we proceed to consider the defenses urged. First, as to the defense of valid appropriation. We conclude that if these defendants had made a valid appropriation prior to the Kimball Decree, all rights secured thereunder would have been lost by the entry of that Decree which awarded them no water. Since the entry of the Kimball Decree in 1922, in fact since 1903, the method for appropriation of unappropriated water has been prescribed by statute and we have consistently held that this statutory procedure for appropriating water is exclusive. *Hammond* v. *Johnson,* supra; *Adams* v. *Portage Irr. Reservoir & Power Co.,* supra; *Deseret Live Stock Co.* v. *Hooppiania,* supra; *Bountiful City* v. *De Luca,* 77 Utah 107, 292 P. 194; 72 A. L. R. 657. Although this statutory proceedure has been amended at various times (see Chap. 105, Laws of Utah 1935, Chap. 111, Laws of Utah 1939) at all times since 1903 the statutory procedure has required a filing of an application with the State Engineer. The evidence fails to show that this procedure was followed by these defendants and their defense of valid appropriation must fail.

In support of their defense of statutory forfeiture for nonuser for five years defendants urge that they have been adversely using this water for over five years. The law in regards to this contention has been discussed above in regards to the claim of Lindsay Land and Livestock Co. where we held that "adverse use" was not statutory "nonuse." Further, if we were to hold that a forfeiture had taken place so that title had reverted to the public, these defendants, having failed to show a statutory appropriation by filing with the State Engineer, could not succeed. The third defense, abandonment, must also fail. There is no showing of an intent to abandon, and if there were, the defendants cannot succeed because of their failure to show a reappropriation by filing with the State Engineer.

The defense of title by adverse user presents a more serious problem. The trial court found that this use was not open and notorious nor was it under claim of right, continuous and uninterrupted. As previously stated, under the statutes in effect during all times involved in these claims, title could be acquired by adverse possession upon a showing of seven years' continuous, uninterrupted, adverse use where the use was open and notorious and under a claim of right. The head of the defendants' ditch was concealed. Plaintiffs testified that they did not know of the ditch until 1934 and that they regularly interrupted the use since that date. On the other hand the defendants used this water each year to make their crops. Their lands were near the public highway which was frequently traveled by the plaintiffs. The land was such that crops could not have been raised without water. In the case of *Utah Power & Light Co.* v. *Richmond Irr. Co.,* supra [79 Utah 602, 12 P. 2d 360], we held that it was inferable that plaintiffs "knew that the Pole creek users were farming and raising crops and using water for such purpose on their lands, and as shown by the record knew that the only source of a supply of water such users had was from Pole creek, and thus the companies knew that

during the irrigation season the Pole creek users were using all of the waters of Pole creek and that they could not have raised crops without the use of such waters." In this case the only available water for these lands was Little Bear River. Summers was a stockholder but plaintiffs knew that he could not water all of his land with water represented by stock. On the authority of the language in the case last cited and viewing the evidence as a whole we are inclined to hold that this use by the defendants was open and notorious although the matter is not without some doubt. But even so, the defendants cannot prevail in this appeal for they have failed to carry their burden of showing seven years of uninterrupted use. Summers admitted there were possibly 12 interruptions. The dates of the interruptions do not appear but we will not assume in the face of this evidence that defendants had seven years of uninterrupted use. However, we do not believe there is sufficient evidence to warrant an affirmative finding that there was not an uninterrupted use for seven years. Since the trial court must reopen the case on other matters, we deem it advisable to reverse the holding of the lower court as to the issue of adverse user as applied to these defendants' claims in the lower ditch and remand the matter with instructions to take additional evidence to ascertain when these interruptions took place.

The defense of estoppel must fail because facts setting up an estoppel have not been proved. There is no showing of fraud, deceit, or reliance on the conduct of the plaintiff to the detriment of the defendants, etc., as required to make out estoppel.

"The elements requisite for estoppel are substantially those necessary to found an action for deceit, with the exception of the element of knowledge of falsity." Weil, Water Rights in Western States, § 593. Weil further points out in § 594 that "Estoppel may arise where the necessary facts are present. But the claim is usually based on silence, standing by, and similar omission to act while another is incurring expense in arranging hostile plans."

According to Hutchins, Selected Problems In the Law of Water Rights in the West, p. 402, rights may be lost

"  *   *   *   by appropriators who by their inequitable conduct, by acts and declarations, have led others to make use of their water rights on the assumption that such use would be entirely legal. Appropriators whose conduct has been such are subsequently estopped from asserting their own rights.

"An estoppel involves turpitude, fraud—such as misleading statements or acts, or concealment of facts by silence—with the result that one party is induced or led by the words, conduct or silence of another party to do things that he otherwise would not have done. The intent to deceive must have existed, or at least there must have been an imputation that the party against whom an estoppel is claimed expected the other party to act. Unless there is some degree of turpitude, a court of equity will not estop one from asserting his title where the effect is to forfeit his property and transfer its enjoyment to another."

No such facts were shown to exist in this case.

In addition to the claimed rights in the lower ditch, Summers claimed the right to divert water out of the Hyrum Canal. The evidence relating to this claim shows that before the Hyrum Canal was developed, there was an older ditch which carried water from Little Bear to certain lands now owned by Summers. Many years ago by permission of the then users of the old ditch, the Hyrum Canal people enlarged the old ditch into the Hyrum Canal. Some of the users of water from the old ditch traded their rights for stock in the Hyrum Canal, but others refused to so trade. Defendant Summers procured by purchase the interests of Edwin Summers and Henry Summers, both of whom had rights in the old ditch. Edwin traded his rights in the old ditch for 5½ shares of stock in the Hyrum Canal; Henry refused to so trade, but continued to use water from Hyrum Canal just as he had used it from the old ditch. Defendant Summers has likewise continued to use water from Hyrum Canal in excess of the water represented by Edwin's stock on the theory that he was using Henry's old rights. The evidence further shows that Henry was offered stock in the Hyrum Canal but that he refused to take it. Neither

Defendant Summers nor Henry Summers nor the predecessors in interest were parties in the Kimball suit. In addition to the rights acquired from Edwin and Henry, Defendant Summers purchased the interest of Wm. Pulsifer who owned 3½ shares of stock. The plaintiffs contend that part of this stock was sold because of the failure to pay assessments and as evidence of said sale introduced a book entry showing a sale of ¼ share to one Nelson. However, the testimony of plaintiffs' witnesses indicates that Summers has since this alleged sale been allowed sufficient water to irrigate on Pulsifer stock a tract of and estimated to consist of about 4 acres.

The trial court did not attempt to ascertain the amount of stock which Summers had in the plaintiff companies. It found that the defendants were entitled to "Their respective shares of water as stockholders only" without finding the extent of Summers' rights as a stockholder. It enjoined the defendants from taking water from the Canal "except by virtue of stock of said corporation owned by the defendants and evidenced by certificates of stock of said corporation whether now in existence or not." Plaintiffs contend that this injunction order does not prejudice Summers and that he cannot complain merely because the court did not find how much stock he owned, that the question of the amount of stock was not involved in this suit. But we do not feel that this injunction order correctly adjudicates Summers' rights. It is clear from the evidence that Summers by virtue of the purchase of Henry's rights did have rights which were not and never had been represented by stock. He was not bound by the Kimball Decree in regards to Henry's rights and should not have been enjoined from asserting these rights. · The evidence does not disclose the extent of the rights formerly owned by Henry but it is clear that by purchase of these rights Summers had rights in addition to those represented by stock or awarded to him by the Kimball Decree. In addition, the evidence shows that Summers still owns part of the 3½

shares of stock formerly owned by Wm. Pulsifer. Whether these rights would be sufficient to irrigate the four acre tract of land or not, Summers has been openly irrigating that four acres for over seven years and the court should have protected his right to continue to so irrigate this tract.

Defendants Cook, Knowels, and Olsen.

Cook, Knowels, and Olsen filed a joint answer in which each claimed the right to divert water out of the Hyrum Canal for use on their respective tracts of land. They set forth their various points of diversion and pleaded an adverse user, abandonment, and estoppel. Knowels owned stock in plaintiff companies. In addition to the rights represented by this stock he claimed, through rights procured from his father, the right to keep a continuous stream running through a loop in part of the old ditch which emptied back into the Hyrum Canal. This water was used to water livestock. He also claims the right to use this water whenever he needs it to irrigate his lands. Neither Cook nor Olsen are stockholders, nevertheless they claim the right to use this water from the canal whenever they need it.

The evidence relating to these claims shows that these three defendants and their predecessors formerly used water from the old ditch before it was enlarged into what is now the Hyrum Canal. They have been using it for over 50 years. Knowels and Olsen were bound by the Kimball Decree, Cook was not. Knowels' father, through rights in the old ditch, used the water whenever he needed it to irrigate the land now owned by Knowels. However, he traded his rights in this old ditch for stock in the Hyrum Canal, and though a party to the Kimball Suit, he was awarded no rights to water for this land except that represented by stcok. There is no evidence to show that Olsen or Cook ever traded or otherwise disposed of their rights in the old ditch, but Olsen lost his rights when the Kimball Decree failed to award him any water. Apparently Cook still has his rights in the old ditch.

Although the rights of Knowles and Olsen must start at a date subsequent to the entry of the Kimball Decree, the evidence shows that all three defendants have used this water each and every year for the past 50 years to irrigate their lands. W. A. Allen who was called by the plaintiffs, testified that he was water master for the plaintiffs in 1923, 1924, 1925, 1926, and 1935. As early as 1923 or 1924 he knew that these defendants were using this water; he knew Olsen and Cook had no stock in the Canal, and that Knowels was using water in excess of the rights represented by stock. He testified that he reported this use to the plaintiffs at this time. The evidence further shows that a flume had been built across the Canal, which flume could only have carried water to Olsen and Cook. A culvert was built under the public highway, also to get water to Olsen and Cook. A dividing box had been built in the Canal many years ago, so that about ¼ c. f. s. was diverted into the loop in the old ditch all the while. The homes of Olsen and Cook were near the public highway which was traveled almost daily by plaintiffs. Both raised lawns, flowers, fruit trees, gardens, etc., which could only have been raised by irrigation of the land. Anyone traveling this highway could readily see that Cook and Olsen were irrigating their lands. While plaintiffs knew as early as 1923 that Olsen and Cook were using this water even though they owned no stock, it appears that this use was seldom interrupted. The interruptions in 1925, 1926, 1934, and 1937 merely emphasized the adverse nature of this case and negatived the possibility that the use was permissive. *Hammond* v. *Johnson*, supra. There is no substantial evidence of an interruption during the 8 years between 1926 and 1934.

Knowels, on the other hand, is a stockholder. As early as 1923 plaintiffs knew that he was using water in excess of that represented by stock. Yet various water masters of the plaintiff companies testified that Knowels seldom objected when they reduced the size of his stream or otherwise regulated his use of the water. At times Knowles would

accept the tickets and irrigate in accordance with them, on other occasions he would become dissatisfied with the tickets and would insist on the right to water 35 acres of land whenever he thought he needed to water it. Plaintiffs testified that whenever they discovered that he was ignoring the tickets and using water in excess of that represented by his stock they would shut the water off entirely.

When the principles of law discussed at length under the claim of defendant Lindsay Land are applied to the evidence regarding the claims of Olsen and Cook we conclude that they have shown seven years of continuous, exclusive uninterrupted use, that their use has been open ██ ██ and notorious under claims of rights in the old ditch, and that plaintiffs knew of the use and knew it was adverse to their rights. This shows acquisition of title by adverse user. In addition there is no evidence to show that Cook ever lost his rights in the old ditch. He was not bound by the Kimball Suit, nor did he trade his rights in the old ditch for stock. He has used this water for 50 years by diverting water from the Little Bear River and running it through his old ditch. When Cook began to use this water somewhere around 1889, water could be appropriated merely by turning or diverting it from its natural channel and putting it to a beneficial use. See Chap. 20, § 6, Laws of Utah 1880. The rights to appropriate public water had long been recognized by acts of Congress (see 14 Stat. L. 253, § 9, U. S. Rev. Stats., § 2339, July 26, 1866, 30 U. S. C. A. § 51) and this legislation has repeatedly been upheld by the United States Supreme Court. See *California-Oregon Power Co.* v. *Beaver Portland Cement Co.*, 1935, 295 U. S. 142, 55 S. Ct. 725, 79 L. Ed. 1356, for a review of the Congressional legislation and some of the earlier decisions concerning it. The doctrine of prior appropriation was recognized by the Utah Territorial Supreme Court in 1870 in the case of *Crane* v. *Winsor*, 2 Utah 248. The facts do not disclose the exact date of Cook's appropriation but it does appear that he was beneficially using the water diverted

from Little Bear River by the old ditch prior to 1889, a date prior to the date of priority of some of the plaintiffs' rights. His rights have apparently never been adjudicated and until the date of his priority is set he cannot be enjoined from using this water and then only by someone with an earlier priority date when there is not sufficient water for both.

Knowels, after the date of the Kimball Decree, had no rights except those represented by stock. His father traded all his rights in the old ditch for this stock and was bound by the Kimball Decree. His claim based on ■ adverse user fails because of his failure to show seven years of uninterrupted, open and notorious use. The evidence showing that he accepted irrigation tickets in plaintiff companies and acquiesced in the regulation of his use of the water by the plaintiffs at times and at other times asserted the right to use water without regard to tickets defeats his claim unless he shows that there was a seven year period during which he at all times openly asserted the right to use the water without regard to the tickets or in excess of the water represented by the tickets. Such a showing has not been made here. Nor has Knowles shown facts to make out an estoppel as discussed under the claim of Summers, Pulsifer and Nuhn. In regards to the defense of abandonment Knowels has not only failed to show an intent to abandon but if there had been abandonment he failed to show that he followed the statutory procedure for reappropriation by filing with the State Engineer. The court correctly limited Knowels to the use of water represented by his stock.

In regard to Knowels' claim of right to keep a continuous stream of water running through the loop in the old ditch and then back into the canal, the evidence shows that the water has so run with little interruption for over 50 years. A permanent dividing box has been built ■ in the canal which always diverts about ¼ c. f. s.

into the loop. Arthur Petersen testified that Knowels told him this right was based on a contract between Knowels' father and the plaintiffs, but if such a contract were made its terms are not disclosed by the record. This use of the water by Knowels would cause very little loss in water by the plaintiffs for the only water actually used is that which would be drunk by the livestock. The evidence regarding a contract negatives the idea that the use was permissive or that it could have been terminated at will. After so long a use under a claim of right, openly and notoriously, we do not believe the evidence indicating that this use was permissive only is sufficient to prevent acquisition of title by adverse user.

## Defendant Samual Bankhead.

Samuel Bankhead filed a separate answer in which he claimed the right to divert water at three places in the Hyrum Canal. The background of his claim and the evidence relating thereto follows:

The Hyrum Canal conveys water from Little Bear River and dumps said water into East Canyon. It does not appear whether East Canyon had a stream running down it or whether it was a dry canyon before plaintiffs dumped water into it. After the water carried from Little Bear River is dumped into East Canyon, it flows down East Canyon for some distance. It is then diverted by a dam across East Canyon into another stretch of the Canal. This East Canyon dam was originally of dirt contruction. There were several springs near it which were referred to by several witnesses as natural springs. These springs together with the leakage through this dirt dam kept a constant flow of water running in the natural channel of East Canyon below the East Canyon dam. Bankhead and his father before him caught this water below the dam and diverted it onto the lands now owned by Bankhead. This use has been open and under a claim of right for over 60 years.

In 1937 a cement dam and fill replaced the old dirt dam, and completely shut off the flow of water down East Canyon

and dried up the so-called natural springs. Bankhead then cut a new opening in the Hyrum Canal to replace the water thus lost. The use of this water taken from this new opening in the Canal has continued since 1937.

Bankhead also claims the right to divert water from two other points along the Hyrum Canal. These claims are based on user for over 60 years under a claim of right. Neither Bankhead nor his predecessors were parties to the Kimball Suit and apparently their rights have never been adjudicated. The evidence of this 60 years use is uncontradicted. The plaintiffs contend that Bankhead has been renting this water. They offered in evidence a receipt for $30.00 issued to Bankhead allegedly in receipt for payment for this rented water. Bankhead countered that the payments were made as his share of canal upkeep expense. However, even if we take this evidence in its most favorable light to the plaintiffs it still only shows rental for about 6 years. Plaintiffs further contend that while Bankhead was allegedly acquiring title by adverse possession he was an employee of plaintiffs employed to prevent unauthorized diversions of water from the canal, but this evidence at the most only shows an employment for the past 8 to 10 years. This still leaves over 50 years during which Bankhead has used the water, not as an employee, without paying rent, under a claim of right, without interruption, etc.

Bankhead bases his claims on appropriation, abandonment, nonuser, adverse possession, prescriptive rights, estoppel and laches. Different legal principles are involved in regards to the right to divert the water which prior to 1937 leaked through the dam and which Bankhead now claims the right to replace by taking an equal amount from the Hyrum Canal, on the one hand, and the right to divert water from the Hyrum Canal at the two other points, on the other hand. We shall, therefore, discuss them separately.

Plaintiffs contend that this water which leaked through the dam or ran around it was not subject, under the circum-

stances of this case, to appropriation. The record fails to disclose whether or not all of the water flowing down East Canyon had been previously appropriated by the plaintitffs. However, under the view we take of the case it is immaterial. If part of the flow was unappropriated public water, Bankhead appropriated that which leaked through the dam by following the statutory procedure in effect in 1880. If all the water had previously been appropriated by the plaintiffs, they forfeited their rights to the water by their failure to use it for over seven years as required by statute. The evidence clearly shows that they let this water run through their dam for about 55 years, and that Bankhead has continuously used this water since about 1880. In 1880 the Legislature enacted a statute (Chap. 20, § 9, Laws of Utah 1880) which provided:

"A continuous neglect to keep in repair any means of diverting, or conveying water, or a continuous failure to use any right to water, for a period of seven years, at any time after the passage of this act, shall be held to be an abandonment and forfeiture of such right."

This statute remained in effect with only minor changes in wording until 1919 when the nonuse period was changed from seven to five years. Laws of 1919, c. 67, p. 178, § 6. Until 1903 when an exclusive method for appropriating water was prescribed by statute, water could be appropriated by merely diverting the water from its natural channel and putting it to a beneficial use. See Chap. 20, § 6, Laws of Utah 1880, which provide:

"A right to the use of water for any lawful purpose, * * * is hereby recognized and acknowledged to have vested and accrued, as a primary right, to the extent of, and reasonable necessity for such use thereof, under any of the following circumstances: First—Whenever any person or persons shall have taken, diverted and used any of the unappropriated water of any natural stream, water course, lake, or spring or other natural source of supply. Second—Whenever any person or persons shall have had the open, peaceable, uninterrupted and continuous use of water for a period of seven years."

Hence after 1880, the failure to keep the dam in repair or failure to use the water for seven years would work a forfeiture. Bankhead could then get title by appropriation by merely diverting the water from the natural channel and putting it to a beneficial use or by using the water openly and peaceably for seven years. It should be noted that the "second" paragraph of the statute last quoted did not even require the seven years of use to be an adverse use. We conclude that title vested in Bankhead by forfeiture and reappropriation under the statute of 1880 and that he did not lose that right when the new dam was placed across East Canyon for he continued to use an equal amount of water by making a new diversion.

This use by Bankhead of this water which leaked through the dam was not an adverse use and would not prevent a forfeiture by the plaintiffs of their rights under the "nonuse statutes" as was the case in the claim of defendant Lindsay Land as discussed above. It is almost universally held that adverse user will not "run upstream."

> "That is, in the usual case adverse use is made by virtue of a diversion which interferes with the use of water by a *downstream* appropriator or riparian owner by actually depriving him of an opportunity to divert the water to the use of which he claims a right. Use of water by one whose point of diversion is located below the headgate of another, however, will seldom be adverse to the upstream claimant, for the reason that the latter is not thereby prevented from diverting water—hence there is no invasion of his rights." Hutchins, Selected Problems in the Law of Water Right in the West, p. 399.

The nonuse of the water by the plaintiffs in this case was entirely due to their own neglect and not in anyway affected by or related to an interference with their rights by Bankhead. Bankhead was using not against the plaintiffs but what the plaintiffs let run to waste. The use was of waters potentially being forfeited.

As to the rights asserted by Bankhead to divert water from two points on the Hyrum Canal, Bankhead must also

be held to succeed as against these plaintiffs. The uncontradicted evidence of this 60 years of uninterrupted use is sufficient to show acquisition of title by adverse user under the principles discussed under claim of Lindsay Land. Bankhead was not bound by the Kimball Decree. During the time he was using this water, title could be acquired by seven years of adverse user. The evidence shows that all the necessary elements are present for acquisition of title by adverse user. The holding of the lower court must be reversed in this regard.

## William Richmond.

Richmond owns a farm which he has the right to irrigate by diverting water from Paradise Canal. In addition he claims the right to divert water from the Hyrum Canal to irrigate about 1½ acres of land upon which he has recently built a new home. The history of this claim follows:

Some fifty years ago his predecessor in interest diverted water from the Paradise Canal, ran it through a private ditch, and watered this 1½ acres of land. A few years later the Hyrum Irrigation Co. by permission from Richmond's predecessor enlarged this private ditch from Paradise Canal and extended it on beyond Richmond's property. The Hyrum Irr. Co. understood that water would still be put into this enlarged ditch for use on this 1½ acres. Richmond purchased this land in 1912. He testified that he never put water from Paradise Canal in the enlarged ditch. He built his new home on this 1½ acres, assuming all the while that he had a right to continue to divert water from this enlarged ditch without putting any water into it from the Paradise Canal. Had he known his right was questioned he could have built his home under the Paradise Canal and procured water there. The sole answer by the plaintiffs was that they did not know Richmond was not making the agreed exchange of water. When they discovered in 1933 that he was not making the exchange, they promptly shut his water off. Since that date they have regularly interfered with his use of this water.

The lower court, on this evidence, found that the diversion of water was not open, notorious nor uninterrupted, but were surreptitious and wrongful and when discovered, were stopped. The only question presented by the appeal in regards to this claim is whether or not the plaintiffs can defeat the acquisition of title by adverse user under these circumstances when they neglected for so many years to investigate the basis of Richmond's use of this water.

It certainly would have been possible for the plaintiffs to ascertain whether or not Richmond was putting water into this canal from the Paradise Canal. The fact that he was not making the exchange could not have been concealed from the plaintiffs if they had sought to █ check the matter. It is hard to believe that Richmond could have been using this water for over 20 years while failing to make the expected exchange, and while plaintiffs' employees were constantly up and down the canal, without having the plaintiffs discover that he was not putting the water into the canal. In *Utah Power & Light Co.* v. *Richmond Irr. Co.*, 79 Utah 602, 12 P. 2d 357, we held that it was inferable that owners of water knew that adverse users were diverting water from the fact that the adverse user was irrigating land in that vicinity and that the only water available was that of the prior owner. We thus indirectly held that it was not necessary to bring the fact of adverse user home to the owner as long as the use was open, notorious and under a claim of right under circumstances such that the owner could have discovered the use by being alert. Apparently the plaintiffs did not know of this use until 1933, but for 20 years they could have ascertained it merely by making an investigation. The use was open in the sense that plaintiffs had the opportunity to discover it. In Weil, Water Rights in the Western States, § 585, it is stated that

"Since the rules of adverse use are punitive, to induce watchfulness, the better view seems to be that it is sufficient if the adverse use was open and without attempt at concealment, but a further restriction is sometimes held, requiring notice of the use to be brought home to the owner."

Under the circumstances here we are inclined to the view that this use was sufficiently open and notorious to permit the acquisition of title by adverse possession. All the other essentials for acquisition of title by adverse user are present and we hold that title to sufficient water to irrigate this tract of land as he has been irrigating it in the past has vested in Richmond.

## Order.

The order of the lower court should be and is hereby reversed as to defendant Lindsay Land and Livestock Co.; reversed as to defendants Summers, Pulsifer and Nuhn in regards to their rights in the "lower ditch" and remanded with instructions to take further evidence on the issue of interruption of the adverse use and to enter findings of fact, and conclusions of law consistent with this opinion on the evidence so produced; reversed as to Summers' rights to make diversion from the Hyrum Canal and remanded with instructions to ascertain the extent of his rights as set out in this opinion; affirmed as to defendant Knowels in regard to his right to divert water for irrigation in excess of rights represented by stock, but reversed as to its order enjoining his diversion of water to keep a continuous stream running in the loop in the old ditch to provide water for livestock; reversed as to Cook, Olsen, Bankhead, and Richmond and remanded for a determination of the extent of their rights.

Appellants Lindsay Land and Livestock Co., Cook, Olsen, Bankhead, and Richmond to recover costs against the respondents; Summers to recover one-half his costs and stand the remainder; Knowles, Pulsifer, and Nuhn to each stand his own costs.

McDONOUGH, J., concurs.

LARSON, Justice (concurring and dissenting).

I concur in the opinion, except as to the part thereof holding that the claim of Lindsay Land and Livestock

Company must fail as to the water used by Nichols. The opinion holds that Nichols, predecessor in interest of Lindsay Land and Livestock Co., had used these waters adversely, ever since the Kimball Decree, but there had never been a seven-year period without an interruption of the user, and lays down the rule that a mere showing that the water had once been turned out of the ditch of the adverse user tolled the running of the seven-year period. From that holding I emphatically dissent. It is decidedly too broad for conditions prevailing in regard to the uses made of the water under the record in this case. Furthermore, it is not in accord with the authorities.

The rule as stated may be correct where the claimed right involves of necessity a constant, continuous possession and use. But here irrigation water is generally not used continuously on the same lands. Irrigation is a rotating process. The land is watered and then the water is shut off for a period of time; then turned on for another soaking, and again shut off. The uncontradicted evidence is that Nichols used the water approximately two days each ten days on one tract, from June to September, inclusive, and on the other tract during July, August and September. After irrigating the land he would shut the water off. Much of the time he did not have any water on the land. The witnesses who testified to turning water off from Nichols' ditches, testified in most cases they did not see Nichols. Many times they did not even go down to see if the water was being used, or was flowing, upon his land. On at least one occasion when they saw Nichols using the water, they asked him to cooperate and use it sparingly because the stream was so small. He answered that he was willing to cooperate and get along with as little proportionately as did the other users, and he would turn it off when he was through. With that they left him to turn it off when he finished his irrigating.

When water is claimed only for limited periods of time, or in limited quantities, or for limited purposes, interrup-

tions in usage must be such as to make an interruption of such right as is claimed; must be such as to molest or interfere with the use to the extent it is claimed or asserted; to the extent of the beneficial use claimed or usable. For example where one claims a right to and usage of water *on Monday from* 6:00 *o'clock a. m. to* 12:00 *o'clock noon* to irrigate an acre of strawberries, shutting off the flow on Tuesday after the patch is watered is not an interference with, or interruption of the use. Of course, when a constant continuous flow is claimed, any interruption in the flow is an interruption in the use. Nichols claimed the water on Mondays and Tuesdays long enough to water his crops on the upper tract; and for the lower tract enough to water the meadow four times a season. Let us take a simple illustration. If A, B, C, D, E, F, and G claimed and used the water of a spring or a stream on Sunday, Monday, Tuesday, Wednesday, Thursday, Friday, Saturday respectively; on every Monday H uses the water adversely for 9 years, without interruption, he is adversing B in the use of the water. Can it be said that if on one occasion, he also attempts to use some water on Friday and F interferes with such use, that such interference is an interruption of the adverse use of B's water on Mondays? We think the question answers itself. In the next place, the interruption of use must be one that is not clandestine, but must be brought home to the user. It must be as open, adverse and notorious as is the user. Acts which would not constitute an interruption of the owner's right or use, will not constitute an interruption of an adverse use.

As indicated by the Chief Justice in his opinion, here every element necessary to establishment of an adverse user was present, unless there were the necessary interruptions to toll the right. I have searched the record in vain for any evidence of an interruption ever made of the claimed right or usage, and I find only one time when the interruption was brought home to Nichols. A witness testified that on one occasion another man told Nichols he had

no right to the water and they were going to turn it off. Even that does not appear to have been when Nichols was using the water within his claimed right. A witness testified that on another occasion he told Nichols he was going to turn off the water. Nichols said that was all right with him, he was leaving and was going home. I find no interruptions of the use asserted or claimed by Nichols to justify the statement in the opinion that there was no seven year period of uninterrupted use.

Let us examine the authorities on the question. First we examine the authorities cited in the prevailing opinion. *Authers* v. *Bryant,* 22 Nev. 242, 38 P. 439, 440, does not support the position for which it is cited. That case turned upon a question of whether the decree was contrary to the findings. The writer of this dissent thinks that opinion rather supports the position herein maintained. There the court found that defendant had used the water adversely for five years immediately preceding the 8th day of June, 1893, when the action was commenced. There is no finding at all of any user by defendant prior to that time. The adverse user statute was 5 years. The trial court also found:

"(4) that in the month of May * * * 1892, *while the defendants were using the water of said stream for the irrigation of said trees,* the plaintiff objected, and forbade them to use it, and claimed and demanded the water, which claim and demand defendants disputed and denied.

"(5) That * * * *at the time mentioned in finding No. 4* precedceding, plaintiff turned the water out of the ditch being used by defendants, and away therefrom * * *."

The appellate court held this finding negatived the general first finding that during those particular five years "defendants had used the water adversely," etc. Be it noted, the finding was that the interruption was at the time when defendants were *using* the water *to irrigate* the trees, and the interruption was brought home directly to defendant at that time.

The next case is *Trenton Water Power Co.* v. *Raff,* 36 N. J. L. 335. This case involved a claimed prescriptive right of an easement to flood another's land and mill, and did not involve anything like a right to the use of water under Western irrigation practice.

In *Armstrong* v. *Payne,* 188 Cal. 585, 206 P. 638, cited by the Chief Justice is an elaborate discussion of this question, which I approve in toto. In *Brattain* v. *Conn,* 50 Or. 156, 91 P. 458, the court said:

"It clearly appears that for more than 20 years the plaintiffs and their predecessors in interest have asserted and *exercised the right each year to construct and maintain, whenever necessary a temporary dam* or obstruction in the main channel of the river to divert from 2,000 to 2,500 inches of water into Small creek for irrigation purposes, and without any intimation from defendants or their predecessors in interest that their right was questioned. *It is true that defendant George Conn testifies that he often tore out and removed the dam, but there is no evidence that plaintiffs knew of this fact; or that it was done at a time when they needed the water.* It was a clandestine and secret invasion of their rights, and we do not understand that an entry by stealth and without the knowledge of the party in possession is sufficient to break the continuity necessary to constitute an adverse possession or to establish a right by prescription." (Italics added.)

Quoting from the Armstrong case [188 Cal. 585, 206 P. 644], we read:

"The testimony offered in this case is to the effect that Armstrong frequently destroyed the diverting dam in Fitzhugh creek. If the court finds that this was done under a claim of right brought home to the defendants either by express notice to them, or that such destruction resulted in such a resumption of the possession of his riparian rights for such a time as was reasonably calculated to give the defendants, as reasonable men, notice of such claim of right, or of such resumption of possession, then the adverse use of the defendant was interrupted, and if each 5-year period of adverse user was so interrupted—that is, if there was no period of five years of continuous adverse user without such interruption—the defendants would not have prescriptive title as against the riparian owner so interrupting the adverse use.

"The defendants only claim the waters of Fitzhugh creek during the early spring and summer before the waters of Mill creek are turned in, and during the season of flood waters. Consequently, in

considering the effect of the interruptions which are relied upon by the plaintiffs to break the continuity of use essential to establish title by prescription, *it should also be noted that the use does not have to be of a continuous flow in order to establish a prescriptive right. That is to say, the adverse claimant may establish a right to use water intermittently and for part of the irrigating season only. If that right is insisted upon and maintained without interruption, a corresponding prescriptive right arises.* This principle is thoroughly established in this state. The latest expression of this court upon that subject is *Northern California Power Co., Consolidated,* v. *Flood,* 186 Cal. 301, 199 P. 315, wherein the court stated as follows:

" 'A right to the use of water for irrigation of land may be acquired by prescription *without showing that the water is actually kept running upon the land all the time.* Irrigation, as usually practiced, is required only at intervals during the season. *If the claimant takes the water and uses it at the time when it is necessary to do so* and does this under claim of right, without molestation by others interested in the stream or ditch, and with their knowledge, actual or implied, *it will be sufficient with respect to continuity of use, although there may be many days or weeks during which he does not use it at all.* The evidence leaves the question of the use of the water during the night time uncertain, not showing clearly whether the continuous use spoken of was during the day only or both day and night for the entire irrigating season. The value of water for irrigation is too great in this state to allow a land owner to gain a right thereto for the entire twenty-four hours of each day by using the same for only a half or any other portion of the time less than the whole. *If he has used it continuously for a certain period each day long enough to gain a prescriptive right to such use he would have a right only for that period,* and he could not lawfully object to the use by others of the flow during the intervening time of each day.' " (Italics added.)

The case of *Santa Paula Water Works* v. *Peralta,* 113 Cal. 38, 45 P. 168, is a case where a right by adverse user was obtained for certain days of the week only, the water being returned to the stream for the balance of the week. The prescriptive right obtained was commensurate with the use.

Said the California court in *Smith* v. *O'Hara,* 43 Cal. 371:

"The right to use the waters, *or a certain portion of them,* might be granted to one person for certain * * *¹ or parts of days, and

to other persons for other specified times. * * * There is no difference in principle between appropriations [rights] of water measured by time, and those measured by volume."

Again in the Armstrong case, supra, the court said:

"Gertrude French claims a portion of the flood waters only, and is entitled to such proportion thereof as has been actually diverted by her and put to beneficial use and used adversely during the period of flood waters * * *."

The extent of the use during the prescriptive period limits and determines the rights. *Wutchumna Water Co.* v. *Ragle*, 148 Cal. 759, 84 P. 162, 165. Adverse use for stock watering alone could gain a right. *Duckworth* v. *Watsonville Water & Light Co.*, 150 Cal. 520, 89 P. 338; same in 158 Cal. 206, 110 P. 927. Consequently the prescriptive right may be for a limited amount of water, for a limited time. *Bashore* v. *Mooney*, 4 Cal. App. 276, 87 P. 553; *Adams* v. *Portage Irr. Reservoir & Power Co.*, 95 Utah 1, 72 P. 2d 648. Petition for rehearing denied in 95 Utah 20, 81 P. 2d 368. As the right is limited by the use, so too is it coextensive with the use.

A use is sufficiently continuous if the adverse claimant used the water *as his needs required*, though not a steady flow. *Hesperia Land & Water Co.* v. *Rogers*, 83 Cal. 10, 23 P. 196, 17 Am. St. Rep. 209; *McDougal* v. *Lame*, 39 Or. 212, 64 P. 864; see also note in 93 Am. St. Rep. 717. He is not required to have the flow when he does not need it. If he uses it regularly when he needs it, this is a continuous use. *But during the time he is actually using it to satisfy his need* he must suffer no interruptions by the true owner. Verbal objection is not an interruption; it must be some act actually stopping the adverse use for a reasonable time. *Oregon, etc., Co.* v. *Allen, etc., Co.*, 41 Or. 209, 69 P. 455, 93 Am. St. Rep. 701; *Cox* v. *Clough*, 70 Cal. 345, 11 P. 732. Secret interruptions do not stop the running of adverse use. *Brittain* v. *Conn*, supra. An adverse user cannot be initiated, nor can such a user once initiated, be interrupted,

unless the other party is *deprived of the benefit of its use* in such a substantial manner as to notify him his rights are being invaded. *Wimer* v. *Simmons,* 27 Or. 1, 39 P. 6, 50 Am. St. Rep. 685; *Boyce* v. *Cupper,* 37 Or. 256, 61 P. 642; *North Powder Milling Co.* v. *Coughanour,* 34 Or. 9, 54 P. 223. Under the system of appropriation in Western states, no prescription can arise, nor interruption be made, by taking or turning off water when the other party has no use for it, because under such circumstances no rights or uses are interfered with. *Smith* v. *Duff,* 39 Mont. 374, 102 P. 981, 133 Am. St. Rep. 582; *Miller* v. *Wheeler,* 54 Wash. 429, 103 P. 641, 23 L. R. A., N. S., 1065; *Morris* v. *Bean,* C. C., 146 F. 433, affirmed in *Bean* v. *Morris,* 9 Cir., 159 F. 651, 86 C. C. A. 519; *Jobling* v. *Tuttle,* 75 Kan. 351, 89 P. 699, 9 L. R. A., N. S., 960; *Egan* v. *Estrada,* 6 Ariz. 248, 56 P. 721.

The authorities therefore lay down the following propositions:

(a) Water rights may be acquired by adverse user.

(b) Such rights may be determined in volume of water or in time used.

(c) It may be for continuous flow, or for specified days or hours, or for crop needs.

(d) A use to initiate a prescriptive right, or an act to interrupt an initiated adverse use, must be one that does actually interfere with the other party's use.

(e) A turning off, or taking of water, when the other party does not need it, or is not making use thereof, is not an adverse use nor an interruption of such use.

(f) An adverse use, like an appropriation, is limited by the extent of the use beneficially applied.

As I search the record, I find the following claimed interruptions of Nichols' adverse use. In 1924, one Allen shut off some water from one of Nichols' ditches. He does not know where the water went, or if it was being

used. He saw no one at the Nichols place and talked to no one. In 1926, Peterson with Leishman and Schaub turned a little water out of the Nichols pasture. They saw no one there, and did not know if the pasture was then watered enough. However, when the water was through the pasture, it flowed back into the river. In 1926, Schaub talked to Nichols and said they were going to shut the water off, but his companion Wilson said they did not shut the water off. The record might support an inference he did so. In 1927, Leishman and Wilson shut off some water in *one of the ditches*. Christiansen said he shut off some water from Nichols' ditch in 1933—later he said he believed it was in 1929. He does not know where the water went, nor if it was being used. He saw no one on Nichols' place. In 1934, he found water on Nichols' land and told Nichols he was going to shut it off. Nichols said "Okay," he was through and was going home. He thinks he shut water off from one of Nichols' ditches in 1935 and 1936. He did not know where the water went or if it was being used. He saw no one at Nichols'. Thomas Fallows said once in 1937, he shut off some water from the Nichols' ditch on Davenport Creek. He did not know where the water went, or if it was being used, or by whom. He saw no one. This is the sum total of claimed interruptions giving the evidence its strongest force against Nichols. On the other hand there is positive evidence that only once (in 1926) was the water turned off when Nichols was using it, and the evidence as to that time came from Nichols himself. Richards shut it off three times in 1938. The record reflects the fact that each time they talked to Nichols they did not shut off the water. I find, therefore, no interruption within the rules laid down by the cases, from 1928 to 1938, a period of ten years. I must conclude, therefore, that the Lindsay Land and Livestock Co. established a claim by adverse user to the Nichols' water. The amount thereof is not certain. The court should determine the amount and the times and manner of its use.

MOFFAT, Justice (concurring).

I concur with the dissenting opinion of Mr. Justice LAR-SON as to the solution of that part of the problem relating to the rights of the Lindsay Livestock Company.

As to the other parties I concur with the solution made by Mr. Chief Justice WOLFE.

HOYT, District Judge (concurring in part and dissenting in part).

I dissent from that part of the opinion which holds that the adverse use of water by George Nichols for a period of five years or more did not result in a forfeiture of that part of plaintiff's right to the State. I also disagree with the opinion insofar as it appears to recognize the possibility of acquiring a water right in Utah by adverse user after the enactment of the water law of 1903. The opinion holds that the plaintiff did not use the water claimed by George Nichols during the period from 1927 until 1933. I think by such nonuse the plaintiff's right to that portion of the stream was forfeited to the State and that defendant's subsequent application to appropriate gave defendant a valid right as against plaintiffs. There is no ambiguity in the statute. The language "when an appropriator ceases to use water for a period of five years the right ceases and thereupon such water reverts to the public and may again be appropriated as provided in this title" appears to be susceptible of only one meaning.

An adverse user cannot be considered a successor in interest of the owner.

"A title based on adverse possession is a new and independent title which is not derived from, or in privity with, that of the former owner, nor is it based upon a presumption of a grant from the original owner." 2 C. J. S. Adverse Possession, § 200, p. 804.

I think it is obvious that it was the intent of the Legislature to require the adverse claimant to apply to the State Engineer to appropriate water before he could acquire

a title. *Deseret Live Stock Co.* v. *Hooppiania et al.*, 66 Utah 25, 239 P. 479. It is true that it has been held by this court in the cases of *Smith* v. *North Canyon Water Co.*, 16 Utah 194, 52 P. 283, *Spring Creek Irr. Co.* v. *Zollinger*, 58 Utah Utah 90, 197 P. 737, and *Ephraim Willow Creek Irr. Co.* v. *Olson*, 70 Utah 95, 258 P. 216, that a water right could be acquired in Utah by seven years' adverse user. Those cases, however, were each governed by a statute, Sec. 2780, C. L. U. 1888, which expressly provided for acquisition of title to a water right by seven years adverse use.

"A right to the use of water for any useful purpose * *ǀ * is hereby recognized and acknowledged to have vested and accrued, as a primary right, to the extent of, and reasonable necessity for such use thereof, under any of the following circumstances: * * * 2. Whenever any person or persons shall have had the open, peaceable, uninterrupted and continuous use of water for a period of seven years."

That statute was repealed in 1897 and has not since been reenacted either in substance or effect. In 1903 the Legislature enacted a new law to govern the appropriation and use of water. That act provided, among other thing, the following:

"Sec. 47. The water of all streams and other sources in this state, whether flowing above or underground, in known or defined channels, is hereby declared to be the property of the public, subject to all existing rights to the use thereof."

"Sec. 50. When the appropriator or his successor in interest abandons or ceases to use water for a period of seven years, the right ceases and thereupon such water reverts to the public and may again be appropriated, as provided in this act."

"Sec. 34. Rights to the use of any of the unappropriated water in the state may be acquired by appropriation, in the manner hereinafter provided and not otherwise."

"Sec. 35. Any person, corporation or association to hereafter acquire the right to the use of any public water shall * * * make an application in writing to the State Engineer," etc.

The law in effect during the times involved in this case was substantially the same as the sections above quoted, except that in 1919 the period specified for forfeiture

for nonuse was shortened from seven years to five years. I think that under the law as it has stood since 1903 no title to a water right, as against the state, could be acquired by adverse user.

If we recognize the right of an adverser to acquire title by larceny or wrongful taking of water for a period of seven years we have given judicial sanction to a practice, which has resulted in innumerable controversies, much costly litigation and some deaths. This court said in *Deseret Live Stock Co.* v. *Hooppiania, supra* [66 Utah 25, 239 P. 483]:

"It is a matter of common knowledge in this state that many controversies arose between claimants and much litigation resulted prior to our legislative act of 1903 respecting the dates of the appropriation by different claimants of the waters of the state. Very much of that litigation had to do exclusively with the dates of the appropriations. The rule or principle of law that he who was first in time was first in right had become permanently established in the jurisprudence of the state. The fact as to who was a prior appropriator was in much, if not all, of the litigation a controverted question, and one which in many cases was most difficult to determine by reason of there being no public record of just when such appropriations were made. It is therefore not only reasonable and fair to conclude, but affords a strong argument to support the claim, that the language found in the act of 1903 was intended to mean and does mean that the only method to be recognized thereafter was the method therein prescribed."

The Legislature in 1939 amended the law to expressly provide that nonuse by the owner of a water right for a period of five years will cause the water to revert to the State, "Whether such unused or abandoned water it permitted to run to waste or is used by others without right." By that amendment the Legislature has made it unmistakably clear that water rights cannot now be acquired by adverse user. It might be said that the amendment of the statute makes it unimportant to discuss the matter at length at this time. The amendment is not retroactive however, and it is therefore important that we avoid an erroneous interpretation of the law existing between 1897 and 1939.

Since the repeal of the statute of 1888 which provided for acquisition of title to water rights by seven years' adverse user, there is no statutory basis for upholding such a title except by applying the statute of limitations relating to actions to recover possession of real property. In my opinion that statute was never intended to be applied to cases involving title to water rights. A reading of Sections 104-2-9, 104-2-10, 104-2-11, and 104-2-12, R. S. seems to me to establish this.

With reference to the rights of the defendants Summers, Pulsifer and Nuhn, it is held in the opinion that the case should be remanded as to them for the taking of further evidence as to their adverse user of water subsequent to the Kimball Decree entered in 1922. Believing as I do that a water right could not be acquired by adverse user subsequent to that date I dissent from that holding. I think that the claim of these three defendants should be denied—except the right which defendant Summers acquired from Henry Summers who was not a party to the Kimball Decree, and which right is held valid in the opinion of the Chief Justice.

As to the claim of the defendant Knowels I concur in the results reached by the Chief Justice. I concur also with the Chief Justice in his holding on the claims of the defendants Cook and Bankhead. I disagree with his holding as to the claims of the defendants Olsen and Richmond on the ground that title could not be acquired by adverse user during the period in which it is asserted these claims were established.

Since the majority of the court holds in this case that title to a water right could be acquired by adverse user during the period subsequent to the Kimball Decree of 1922, but the members are divided as to whether there was any sufficient interruption of George Nichols' adverse user to prevent it from ripening into a title, it is necessary for me to express my opinion on that point. It is my opinion that there was no sufficient

interruption of George Nichols' adverse user to prevent it from ripening into a title—where the right to acquire title by adverse user is recognized.

PRATT, J., on leave of absence.