## JACKSON v. SPANISH FORK WEST FIELD IRRIGATION CO. et al.

No. 7450.   Decided November 9, 1950.   (223 P. 2d 827)

See 67 C. J. Waters, Sec. 538. Prescriptive rights as to waters, see note, 172 A. L. R. 193.   See also 6 Am. Jur. 764.

*Elias Hansen,* Salt Lake City, for appellants.

*Clinton D. Vernon,* Attorney General, for State Engineer.

*P. N. Anderson, Dilworth Woolley,* Manti, for respondent.

PRATT, Chief Justice.

The plaintiff commenced this action to quiet title in himself to one cubic foot per second continuous flow, of the waters of Thistle Creek, a tributary of Spanish Fork River, and for damages for the interference with his use thereof during a part of the 1948 irrigation season.

The plaintiff is a resident of Spanish Fork Canyon, in the area called Clinton or Birdseye, and claims the right to the use of 1 c. f. s. for the irrigation of 19 acres of farm land, for culinary, and for stock watering purposes. The right is claimed to have arisen by adverse user of the water over the requisite seven year period, and before 1939 when statutory enactments precluded this method of initiation of water rights.

The period of continuous use claimed by the plaintiff was begun as early as 1891, by his predecessors in interest in the land. In 1899, an adjudication was had as to the rights of the residents of Spanish Fork Canyon and those further down in the valley, which culminated in a decree called the McCarty Decree. This decree fixed the rights of all parties on the stream, including those of plaintiff's remote grantor. However, it is contended that after the 1899 decree, the predecessors in interest of the plaintiff continued to use the 1 c. f. s. as before, and that this adverse user ripened into a perfected right.

The 19 acres owned by William D. Jackson is near the mouth of Spanish Fork Canyon, on Thistle Creek. This land is of a highly porous nature, composed for the most part of sandy loam. Jackson owns other land in the area

as well. He has 35 acres feet of water rights in Strawberry Reservoir and has 20 acres of secondary rights in Thistle Creek, the latter under the McCarty Decree. Jackson's diversion point from Thistle Creek is the last one in the canyon. That is, all other residents of the canyon area have their diversion points further up the stream than does he for this 19 plus acres of land, although in point of location some of the users are actually further down the canyon than he.

Under the McCarty Decree, the "canyon people" so-called, were allowed substantially all the water they needed, so long as the flow of the Spanish Fork River remained above 344.5 c. f. s. at a point measured below the mouth of the canyon. This is generally during the early spring high water season. After the flow recedes below this point, but above 253.5 c. f. s. they were allowed 2% of the flow, and between 253.5 and 118.4, they were entitled to 1% of the flow of Thistle Creek and its tributaries. These rights were all secondary and tertiary rights, and after the flow receded below 118.4 c. f. s., only 30 acres of primary rights existed in the canyon people, and are not material to this inquiry. The McCarty Decree provided in its terms for weir measurements, but for convenience in measuring on the part of all concerned, these weir measurements have been converted to second feet, and the figures are not in dispute. The water to which the canyon people are entitled is also apportioned among the canyon users, by the decree.

The Strawberry Reservoir Project provides irrigation water for much of the south end of Utah County, but is so situated that while the lower users of the Spanish Fork River can utilize this water, the people in Spanish Fork Canyon cannot. Accordingly, an agreement was entered into by and between the property owners in Spanish Fork Canyon, and the Irrigation Companies representing the

lower users of the Spanish Fork River, whereby the canyon users might purchase Strawberry Reservoir water from the Federal Government, and exchange it for the waters of Thistle Creek and its tributaries. In this way the canyon people would use water direct from Thistle Creek and its tributaries which actually belonged to the lower users, and the lower users would use the Strawberry water purchased by the canyon people. The procedure then was that the canyon people when they desired to use water, would, through the water master, notify the Strawberry Reservoir Water Users Association, who would turn the desired amount into the Spanish Fork River to replace the water which the canyon people would withdraw from Thistle Creek. The amount so released from Strawberry Reservoir, would then be deducted from the acre feet subscribed by the individual property owners in the canyon. When canyon users were not using the waters of Thistle Creek on this exchange basis the waters of that creek flowed on into the Spanish Fork River and were used by the lower users pursuant to their appropriations. The canyon users were also allowed to let their secondary and tertiary rights accumulate by letting the lower users receive all the waters of Thistle Creek, and then they would receive a corresponding credit and use their secondary and tertiary water rights in consolidated turns. Thus, when Strawberry Reservoir water is referred to herein as being used by the canyon people, the reference is to waters of Thistle Creek used by the canyon people and replaced for the lower users by having Strawberry Reservoir water released to them and charged against his subscription therein. The right to the use of the 1 c. f. s. according to testimony for plaintiff was perfected prior to the existence of rights in Strawberry Project on the part of his predecessors in interest, and before any exchange contract with the lower users had ever been made.

According to Jackson, the 1 c. f. s. was allowed to flow

onto the land continuously through what is known presently as the Jackson West Ditch. This ditch serves no other land or water user. Jackson rotates the water from field to field, to sustain his crops growing on the 19 plus acres, and uses it for stock watering. These were the same uses as those to which the 1 c. f. s. was put by his predecessors in interest. In addition, he has a well near his house, from which his family secures culinary water, which well is fed by percolating water from the irrigation of an adjoining field. This well was used for the same purpose by his predecessors in interest. When the field adjoining the house is not irrigated every four days, the well recedes rapidly to a point where it cannot be pumped for culinary use, and the water becomes discolored and carries bad odors and tastes, and is unfit for human consumption.

During the irrigation season of 1948, the water master at the instance of the defendants herein, shut off the water flowing in the Jackson West Ditch, through which Jackson took the 1 c. f. s. stream, and refused to let him have water except as he had the right to water under the McCarty Decree, or Strawberry Reservoir water. In consequence, plaintiff complains that the hay growing on the 19 acres failed to mature, in fact burned brown, and the land was also ruined for pasture, and for this he asks damages. A temporary restraining order against the defendants allowed plaintiff the use of the water after August 19, 1948.

It is contended by the appellants that the evidence does not support the determination of the lower court that plaintiff and his predecessors in interest have acquired title to 1 c. f. s. by adverse user for a period of seven years. As to the necessary requirements for so initiating a right see *Wellsville East Field Irrigation Co. et al.* v. *Lindsay Land & Livestock Co., et al.*, 104 Utah 448, 137 P. 2d 634, and cases cited and discussed therein. No worth-

while purpose would be served by delineating the evidence in detail. Sufficient to say that plaintiff's evidence by several witnesses established the adverse use for the requisite length of time. The testimony of the various witnesses for the plaintiff covered the periods 1891 to 1911, 1913 to 1936, 1910, 1909 to 1920, 1912 to 1930, 1910 to 1938. The tenor of all this testimony was, that the only time when there was no water in the Jackson West Ditch during the periods covered, was when the owners of the land now owned by Jackson had the water off to clean the ditch.

One witness who testified as to the period from 1923 to 1935, and who lived near by during those years, traveled the road two to four times each week, and sometimes more often, and particularly during the months of July, August and September, of each year, as road supervisor. The road adjoined the 19 acres and the diversion point from Thistle Creek of the Jackson West Ditch was alongside this road during that period, and the stream when diverted crossed the road four times, and later, after the road was re-routed somewhat, crossed it twice. During the early history of the Jackson West Ditch, there were no bridges across it and it had to be forded when passing along the road. This was a factor which caused several of the witnesses to recall that there was always water in the stream. This particular witness rested at noon each day in a grove of trees on the 19 acres, near the diversion point of the Jackson West Ditch. He recalled that the water in the ditch would overflow whenever a little trash collected, and that sheep traveling across the stream and passing along the road would break the banks of the stream down so that it had to be repaired frequently. He testified that at no time when he crossed the stream and traveled the road was there a lack of water in the Jackson West Ditch. He had observed the crops grown on the land and characterized them as good crops.

Another witness traveled the road approximately four times a week in each direction, from 1909 to 1920. She testified that the stream was always flowing. She saw occupants of the land using the water; she got stuck at times in the ditch where it crossed the road, and had observed the crops growing in the fields, and they were always good crops raised on the property. Her husband testified to substantially the same things.

Other witnesses traveled the road less frequently, but testified there was always a stream flowing in the Jackson West Ditch when they crossed it. Some of these persons drove sheep into and out of the canyon and had trouble with the stream in that the sheep in crossing would break down the banks and necessitate repairs to the banks. They uniformly indicated that a continuous flow of 1 c. f. s. or more was diverted from Thistle Creek into the Jackson West Ditch, and uniformly stated that there was always water in the Jackson West Ditch.

A witness familiar with the area since 1889 indicated that the lower water users would come up and shut off the canyon water users when the river receded, but that he did not notice any appreciable difference in the flow on plaintiff's property after the lower users came up.

Under the McCarty Decree and the Strawberry Reservoir water rights, the owners of the land could have been using water from these sources only intermittently after the high water run-off, yet the witnesses for the plaintiff uniformly testified that the same conditions prevailed as to the ditch late in the season, as they did in the early run-off season. They also testified that the crops raised on the land by plaintiff's predecessors in interest were good crops, as good as any in the area, and better than average crops. A part of the time when such crops were raised was before the Strawberry Reservoir project was completed, or at least before the contract agreement be-

tween the canyon people and the lower users allowing the canyon people to subscribe to Strawberry Reservoir water which they could exchange with the lower users for the waters of Thistle Creek. During the 1948 season without the 1 c. f. s. the land failed to produce crops.

Each witness for plaintiff who observed the situation both in years past, and after the temporary restraining order had restored the 1 c. f. s. indicated that the stream of the past was larger than the present stream.

There were interruptions in the use of the stream testified to by witnesses for the defendants. The first of these was on August 4, 1914, and after about 1923, there were several interruptions in the use of the stream in the Jackson West Ditch. The existence of such interruptions seems to confirm that there existed such a use, and that the use was with the knowledge of the defendants, and adverse to them. *Wellsville East Field Irrigation Co.* v. *Lindsay Land and Livestock Co.,* supra. The point of diversion was right beside the road, and the old road before it was moved crossed the stream several times. The diversion of the water was open and notorious. The period for perfecting a right by adverse user had passed twice over from 1899 to 1914, when the first interruption occurred. Some of the defendant's evidence tends also to show the flow to be near 1 c. f. s. Witness Hart, water commissioner in 1906, measured the stream flowing in the ditch at .98 c. f. s., which he did not shut off although it was flowing onto the land. Another period from 1914 to 1923 exists when there was no showing of interference by defendants with the flow of water at the rate of 1 c. f. s., which plaintiff's witnesses established as flowing continuously during that time. Here again was a sufficient time for the adverse period to have run.

We conclude that there is ample evidence from which the

court could find as it did that a right had been perfected by adverse user. ∎

It is contended that there is no evidence to show the amount of water used by the plaintiff and his predecessors in interest on this land other than water under the McCarty Decree and Strawberry Reservoir water. The amount was sufficiently established to be 1 c. f. s. or more by all the witnesses for plaintiff, and McCarty decreed water and Strawberry Reservoir water were used only infrequently on this land according to the testimony, and then only to increase the flow so as to irrigate remote and hilly parts of the land. Much of the evidence dealt with periods before Strawberry Reservoir water was used.

It is also contended that plaintiff has failed to show a beneficial use of 1 c. f. s. on the 19 acres of land in addition to the McCarty decreed water and Strawberry Reservoir water. We have indicated that little McCarty decreed water and little Strawberry Reservoir water was used on the land, and these rights held by Jackson and his predecessors in interest were used on other lands, and that the use of the 1 c. f. s. antedated the Strawberry Project. McCarty decreed water after the run-off season amounted to very little water to the predecessors in interest of the plaintiff or to the plaintiff. The McCarty decreed water which went to the canyon people was 2% of the stream when the flow was above 253.5 c. f. s. and 1% after it got below 253.5 c. f. s., and until it receded to 118.4 c. f. s. after which all secondary and tertiary rights ceased to exist. As indicated by a witness for the defendants, the present water master, all the rights of the canyon people combined amounted to very little water after the McCarty Decree took effect each year.

Dr. Farnsworth, Associate Professor of Agronomy, at the Brigham Young University, testified as an expert witness, and indicated that the soil on the 19 acres was

generally sandy and porous and would not hold water as well as other types of soil; that some parts of it needed irrigation every four days, and that it would need irrigation every six days on an average. He stated as his opinion that 1 c. f. s. of water, continuous flow, could be put to a beneficial use on this land. In addition, there must also be considered the culinary uses and the stock watering uses. If plaintiff's witnesses are to be believed, the land grew better than average crops with the water, and failed to produce crops without the water. While the usual duty of water to land generally in this state is considerably lower than here claimed, the special circumstances as to soil type and use are such as to indicate a beneficial use of the 1 c. f. s. continuous flow.

Next it is contended that the trial court could not enter a judgment or decree amending the McCarty decree without having all parties before it. Such is not the case here, however. The instant case is not one of amending the decree, but rather a determination that plaintiff has adversed the defendants out of 1 c. f. s. of the water awarded them under the McCarty Decree.

A question is raised as to the striking of testimony of one of defendants' witnesses. The testimony stricken came within the purview of Section 104—49—2, U. C. A. 1943, the "Dead Man" statute, according to the ruling which is not contested. The only question is the amount of testimony thus excluded. We think it clear from the court's ruling that he was only striking that testimony which fell within the rule, and that no other testimony of this witness was stricken. This is made amply clear by the consideration of the testimony of this witness in the memorandum decision written by the trial judge.

Finally, it is contended that the evidence fails to show that the defendants are liable for damages sustained by

plaintiff by reason of depriving him of water during the 1948 irrigation season.

The argument here is that since the State Engineer and his assistant, the water commissioner, are required to distribute the water as by law required, that it follows that the water companies requesting that the water commissioner do just that cannot be liable when he performs this duty. It is said "If a water user claims he has a water right not covered by a decree, his recourse is to the courts and neither the water commissioner nor one who claims a right to use of a water right may lawfully ignore the provisions of a decree of a Court of competent jurisdiction (McCarty Decree) so long as the same remains in effect." This argument overlooks the fact that the perfection of the right to 1 c. f. s. continuous flow of the waters of Thistle Creek by Jackson's predecessors in interest occurred, not by virtue of the present court proceeding, but rather by vesting of the right under the rules of adverse user, cutting off the rights of the defendants thereby in that 1 c. f. s. The present action vindicates Jackson's rights, it does not initiate them, nor perfect them, and unless he or his predecessors in interest have in some way forfeited or abandoned the right, or it has been wrested away from him or them by adverse user before 1939, the right has continued to exist since first initiated by seven years adverse use together with meeting the other requirements as indicated in the Wellsville case, supra. No contention is advanced that any such abandonment forfeiture or adverse user has divested Jackson or his predecessor in interest of the perfected right to 1 c. f. s. continuous flow. Therefore, the right has existed in Jackson and his predecessors in interest from the lapse of the first seven year period following the McCarty Decree during which the other requirements were also met. The protection of the defendants lay not in seeking to shut off the 1 c. f. s. in 1948, many years after

Jackson's rights have become fixed, but rather in using diligence to protect their rights by taking steps during the seven years when Jackson's predecessors in interest were trespassers as to the water, to see that they did not appropriate the water to which they were not entitled. This they did not do.

Judgment of the lower court is affirmed. Costs to respondent.

WADE, LATIMER and McDONOUGH, J.J., concur.

WOLFE, Justice (concurring).

The doctrine that a party could gain title to water by adverse user for a period of seven years was, at best, dubious. Because water for certain purposes and especially when appurtenant and used on a particular piece of real estate was governed by legal principles pertaining to real estate, there grew up in this jurisdiction and some others, the doctrine that water could be adversed as could land. But water is, of course, quite different from land. The latter is stationary; any use of it ordinarily is easily ascertained by inspection. Moreover, as an additional act of notoriety, a claimant to gain title to land by adverse possession must pay all the taxes levied against the property for the seven year period.

Water, as distinguished from land, is fugitive; its constituent particles are only temporarily possessed even when taken from the source of the waters. It is the right to use, and in order to use, to reduce to possession, which is invested in the owner by appropriation. And no taxes are assessed against the water itself albeit if the water is appurtenant to particular land and used thereon, it may share in inducing a greater tax because the land with the water may be more valuable. In fact, the water right may be far more valuable than the land on which or in connection with which it is used.

In *Wellsville East Field Irrigation Company et al.* v. *Lindsay Land & Livestock Company,* 104 Utah 448, 137 P. 2d 634, this court recognized that the doctrine that title to water may be acquired by adverse possession had been part of the law of this state for a number of years. In that case, a predecessor of the Lindsay Land & Livestock Company had appeared in court in response to a summons in a suit to adjudicate rights on a stream, announced his presence verbally, but never answered as defendant. After a decree which excluded him as owning any water right, he continued to use that water which he had been using for more than seven years. There was no question about the use nor that those who were entitled to the water had notice of his use and had even interrupted it from time to time. The question was as to whether the interruptions were sufficient to break the continuity of the adverse claimant's use.

Since 1939, a water right cannot be initiated nor acquired by adverse possession and user in this state. Probably the number of water rights gained by seven years' adverse user in this state are comparatively few. But once having been acquired, such a right gives the acquirer as good a title as a decree, and if acquired against a decreed right, a better title to that water, although it may require a new decree as to the particular adversed water to gain a good record of the title. The fact that where a user takes water from a source from which others take and that all the water looks the same and may be commingled with water taken under decreed or unquestioned rights, and that unless the excess over his vested right is so great as to make it apparent to other legitimate users that he is exceeding his right, he may continue to wrongly take water for many years and may have done so for seven years or more before 1939. Finally, a time comes when other users either thitherto unaware of his trespass

or perhaps, suspecting it, but being too timorous as neighbors to challenge it, do challenge it.

I think adversing water in a state largely dependent on water for its economy should have been declared as contrary to public policy and never by judicial pronouncement been allowed. Since it was permitted, it should not receive judicial sanction unless the evidence is clear and convincing. I believe the evidence in this case is of such a nature as to be clear and convincing to a reasonable mind.

I therefore concur.