PROVO RIVER WATER USERS ASSOCIATION, a corporation, et al., Plaintiffs and Respondents,

v.

Hubert C. LAMBERT, as State Engineer of the State of Utah; Provo City Corporation, et al., Defendants and Appellants,

Lawson O. Hamblin and Ida Hamblin, his wife, Intervenors and Appellants.

No. 16724.

Supreme Court of Utah.

Feb. 10, 1982.

Joseph Novak, Dallin W. Jensen, Thomas E. Clyde, Erie V. Boorman, Ray L. Montgomery, Thomas W. Forsgren, Salt Lake City, for defendants and appellants.

Jackson Howard, Provo, E. J. Skeen, Salt Lake City, for plaintiffs and respondents.

HENRIOD, Retired Justice:

This is a case involving the ownership of the right to use 2.52 cubic feet per second of the waters of Provo River, a tributary of Utah Lake in central Utah. It has a protracted and somewhat litigious history in more than one sense and some of the facts about which it is concerned predate the statutory interdiction that turned the method of appropriation from a diligence use only to one conditioned on filing an application with the Utah State Engineer as provided by statute,[1] followed by opinions such as *Wellsville v. Lindsay*[2] to the effect that the state was the sole purveyor of practically all of the waters of the state.

1. Ch. 100, Laws of Utah 1903.

2. 104 Utah 448, 137 P.2d 634 (1943).

The water claimed in this case initially was appropriated before the statute mentioned and was the subject of adjudication long, long ago in the "Chidester" decree.[3]

The water rights involved here, along with that of other claimants were laid to rest on May 21, 1921, in the "Provo River" or "Morse Decree."[4] It is sort of a Bible controlling the waters of a good portion of the Provo River, that meander to another sort of scriptural Dead Sea, via Utah Lake, and another similar landmark, the Jordan River to the Great Salt Lake. Some of the Chapters of the Decree are the Genesis of this litigation. Pertinent language is written in Paragraphs 28 and 124, reproduced and italicized for emphasis as follows:

### 28

JOHN D. DIXON. *From January 1st to December 31st.*

As successor in interest to J. H. Snyder, Joshua J. Mecham, John W. Hoover, and Hyrum Heiselt to 2.80 second feet of water which was appropriated upon lands in Provo Canyon, *the place* of use and the *point of diversion having been changed* and the said water is now being used upon lands below the mouth of Provo Canyon, and the point of diversion from Provo River is now at and near the mouth of Provo Canyon, Utah County, Utah, and *said use may be continued and the quantity to which the said defendant is entitled* at his said point of diversion, at and near the mouth of Provo Canyon, *is 2.52 second feet*; the same being of the transferred water rights referred to in subdivision (a) paragraph 33, hereof.

### 124

*That all rights declared and decreed herein, for domestic and municipal uses and for the generation of power, are continuous throughout the year without limitation to time or season.*

*And that all the rights declared and decreed herein, for irrigation purposes, include the right to divert and use water for irrigation, culinary, domestic and agricultural purposes connected therewith. And such rights of diversion and use for culinary, and domestic purposes are continuous throughout the year, and are limited to the quantity reasonably necessary for said uses. And such rights of diversion and use for irrigation purposes is confined to the irrigation season of each year, and none of said parties shall divert or use any of said waters, (except for culinary and domestic purposes as hereinbefore provided), during the non-irrigating season—after the necessity for such use for irrigation purposes has ceased in the Autumn of each year and until it is necessary to use the same for irrigation purposes in the Spring of the year following.*

The language reflects a right to a year-round, January 1st to December 31st, use by John D. Dixon, in fact and presumptively, for present and future use of *2.52* cubic feet per second of Provo River water for *culinary* and *domestic* purposes during the irrigation and *non-irrigation* seasons, specifically defining the *irrigation* season as only from spring to autumn, which therefore defines non-irrigation as the remaining or winter months.

Since some of the Points on Appeal are mooted by our decision, the following observations and conclusions may be catalogued to expedite, and avoid confusion:

1. Provo City, having acquired the rights of any conflicting claims of others, for the purposes of this case, has whatever rights in the subject water, that were awarded to John D. Dixon in the Morse Decree.

2. We differ from the trial court's "finding" that Provo City had the burden of proving its own right to the water, concluding that such burden is on the plaintiffs

---

3. *Provo River v. Telluride*, Civil No. 957, Fourth Judicial District Court in and for Utah County, State of Utah, January 26, 1907.

4. *Provo Reservoir Co. v. Provo City*, Civil No. 2888, Fourth District Court, Utah County, May 21, 1921.

attacking it,—the Provo River Water Users Association, et al., who alleged that defendants had never exercised such rights. Plaintiffs' assertion that because the interveners, Hamblin, had questioned Provo City's right and Provo City resisted the claim, and reasserted its own, that somehow this circumstance would shift the burden of proof. Since Provo need not have had to prove its claim against plaintiffs, we cannot see how plaintiffs could avoid their primary obligation to take over the laboring oar.

3. Our conclusion above is not the primary ratio decidendi here, and therefore, a remand for a new trial is not necessary or ordered for that reason.

Addressing ourselves to the "burden of proof" issue that seriously was debated below, we refer to some of our own pronouncements to the effect that generally he who asserts something has the burden to prove it.

In *Tanner v. Humphreys,*[5] a forerunner of this case, we said that:

> In an application for a change of diversion, it is not necessary for a party so applying each time to make a showing that it has beneficially used its water right. If it has not, then the protestants may so show....
>
> ... It may be that the plaintiff should put in general proof that the change will not injure or disturb vested rights, but if so, it is rather in homage to the general rule that he is required to offer proof in support of all his allegations, and ... the burden rests upon the plaintiff to establish the necessary facts to make out a prima facie case.... *We must assume that the rights which the decree No. 2888 Civil gave to Dixon still belong to the plaintiff.*

Later, we said as much in *Wellsville v. Lindsay:*[6]

> The burden is on the person asserting abandonment to prove it. Here there is no evidence to show an intent to abandon. In fact, the evidence almost conclusively

shows just the contrary. We must conclude that the plaintiffs did not abandon their rights to this water and this defense must fall.

That case had to do with an abandonment, which is not pleaded in the instant case,—the plaintiffs here simply alleging that there was no right in esse *at any time* that *could be* abandoned, but we opine that the same rule as to burden of proof and the policy of reason behind it are equally apropos here.

Irrespective of the above, or any other rule as to the burden of proof, the plaintiffs offered *none,* but Provo City *did* present cogent evidence attesting to its right to use the water by putting in evidence the Morse Decree, and the deposition of an experienced water man and an eyewitness before, at, and after the Morse Decree was penned and entered on May 21, 1921.

4. The issues here, stated in plaintiffs' brief, are:

a) Whether Provo City is entitled to divert any water during the *non-irrigation season* under the *Dixon Right*; and

b) Whether there is *any* substantial *evidence* to support the basic findings of the trial court that *no* water was required for *domestic* and *culinary* purposes on the Dixon premises during the *non-irrigation* season *under the Dixon Right at the time of entry of the (Morse) Decree* [with which we have no particular quarrel].

We conclude as to 4a), supra, that Provo City is entitled to divert the 2.52 cubic feet per second of the water as owner of the right to use it under the terms of the Morse Decree, and as to 4b), there is nothing substantial or whatever in the record to support the trial court's finding that there was no water used as stated therein.

In saying so, we are mindful of the myriad of decisions affirming the lower courts if there is substantial evidence to affirm. We simply conclude that the Morse Decree awarded John D. Dixon the right involved, that there has been no appeal therefrom

---

**5.** 87 Utah 164, 48 P.2d 484 (1935).

**6.** Supra, note 2.

and that the Decree has been honored and respected by everyone from its inception, May 21, 1921, until questioned by letter authored by the plaintiff, Provo River Water Users Assn., on March 8, 1967, addressed to the State Engineer in the form of a demand to discontinue *distribution* of the subject water thereafter,—an event occurring 46 years after the Decree.

5. The only order or decree involving the use of water in this case that can be said to be "res judicata" is the Morse Decree itself.

The statute, having to do with the Engineer's authority,[7] leaves dispositive orders or judgments to the courts, and all of the orders or judgments involved in this case have conceded that John D. Dixon, Esthma Tanner, his successor, and Provo City, her successor, have had and do have a right to use 2.52 cubic feet per second of water for culinary or domestic purposes, or its statutory equivalent by exchange,[8] and the only matter of concern is whether John D. Dixon used or was entitled to use the amount of water on or about (or as plaintiffs say, *on that day*) May 21, 1921.

6. That all other issues raised as to whether plaintiffs' two causes of action,—one under the declaratory judgment legislation [9] and one for review of the State Engineer's orders,[10] the finality of the Morse Decree, alleged error in not recognizing previous decrees, etc., need not be discussed in light of our opinion here, since they are moot.

In support of our conclusion, we set out briefly the chronology and reasons therefor extending over a half century time frame following the Morse Decree:

In 1924, Dixon transferred his right to one Caleb Tanner, followed by Esthma Tanner's acquisition thereof, she representing a key figure in this water saga. In 1931, she filed an application with the State Engineer, No. a–1171, to change the *use* of the water from culinary and domestic use, with Provo City, for its domestic and municipal use, *and also* to change the *point of diversion* of the water. The State Engineer rejected the application, followed by her appeal to the Fourth District Court,[11] which affirmed the State Engineer. She appealed that decision in 1934 to this Court, which in 1935, in a purely directory decision, reversed the decision below without determining any rights,[12] but remanding the matter for a plenary trial, which was accomplished, ending in findings of fact among which was one confirming Esthma's ownership of the right *before* the application "and at all times since." The judgment in that case also was directory only, and it simply reinstated Esthma's Application No. a–1171 to its original 1931 date, "*subject to existing rights* of the parties and *without prejudice to challenge* the rights of the parties thereafter in Provo River water."

Some nine years later, after Provo City had used the full volume of the decreed water and after having purchased Esthma's right in 1940, the *City* filed an Application No. a–2502, on November 16, 1950, for a change in *point of diversion*,—not in *use*, and continued to use the water until the application was approved by the State Engineer in Order No. a–460 on February 9, 1966, authorizing the taking of the water from a different site for the more convenient use of the full 2.52 cubic feet per second of the water already having been used beneficially and continuously since about the time of Esthma's first Application No. a–1171 in 1931.

The Utah Power and Light Co. had been the sole "protestant" at the hearing, but it did not appeal the original, Feb. 19, 1966, a–460 order. None of the plaintiffs, except Utah Power and Light, protested Applica-

---

7. 73–2–1 et seq., U.C.A. 1953.

8. Ch. 67, Sec. 8, L.Ut. 1919; Sec. 100–3–3, Rev.St.Ut. 1933, 1943; Sec. 73–3–3, U.C.A. 1953.

9. Sec. 78–33–2, U.C.A. 1953.

10. Secs. 73–3–14 and 15, U.C.A. 1953.

11. *Tanner v. Humphreys*, Civil No. 8481.

12. *Tanner v. Humphreys*, 87 Utah 164, 48 P.2d 484 (1935).

tion No. a–2502, or the a–460 order issued therein, nor did any of them attempt to intervene in any of the litigation involving the subject water, albeit almost all could have done so,[13] nor have any of them ever filed for appropriation of the water which under their contentions would have been escape water that would have been appropriable.

In spite of the above long history of inaction or non-assertion of rights, on March 8, 1967, over a year after the a–460 order, and about 10 months after the statutory time to review it had expired, the plaintiff, Provo River Water Users Association, wrote a letter to the State Engineer requesting that no more of the 2.52 c.f.s. of water be distributed to Provo City. The letter appeared to be short on specifics, but not so short on implication that if Provo were unable to put the water to use it would run downstream as waste water until it mingled with Utah Lake, whose waters were the principal source of supply under the claims of the plaintiffs. Nonetheless, the Engineer apparently, without being required to, but out of a spirit of fair play, held a hearing and cut the former flow to Provo in half, resulting in the other half, which no one had filed to appropriate, running as waste water into the lake.[14]

Strangely enough, both sides questioned the Engineer's authority to amend the previous order. At any rate, the Water Users "appealed" from the "amendment" which posed the issue as to their standing in court to do so, but which we do not consider in this decision.

 Since everyone concedes that Dixon had a right to use the water under the Morse Decree, it is presumed to persist until someone successfully defeats it for some better reason than that urged by the plaintiffs that there is no evidence that Dixon ever exercised his right by using the water during the non-irrigation season,—discussed hereinafter. Suffice to say that such conclusion is adjunct to a negative,—absence of fact,—and a non-sequitur winking at the presumption of ownership born of the Decree, ignoring the sworn testimony of an eyewitness, and looking through blinders at the almost half-century recognition of the uninterrupted right started by the Decree, the State Engineer's approval, the trial court's acknowledgment of it, this Court's blessing of it, and even the plaintiffs' silent tribute to it by virtue of their failure to question such right, or assert any claimed interest therein, or pursue any effort to appropriate the water for lack of use by Dixon, et al., other than to write a letter of objection after that almost half-century interim since the Decree.

The presumption of ownership of the water right must be destroyed by facts or for some other legal reason, neither of which is present in this case, so far as plaintiffs are concerned, since they rested without proffering any facts save silence. On the other hand, the defendant, without any legal obligation so to do, *did* offer facts that were unrebutted,—first, the Morse Decree because it is in every sense "res judicata," and secondly, the eyewitness testimony of Newell, uncontradicted and unimpeached.

As to the trial court's finding, which we consider and hold to have been unsupported in the record, either documentary or deposition-wise, that: "This action is the first time any court of competent jurisdiction has been called upon to determine and fix the quantity of water as was reasonably required for domestic and culinary purposes during the non-irrigation season where the water was used under the John D. Dixon Water Right at the time of the Decree,"— we believe to be an ipse dixit, at variance with, not supported by either law or fact, and not in harmony with one of the most respected presumptions in our law,—that of continued ownership and use of one's once-established right thereto, until clearly upset

13. Plaintiff Provo River Water Users was incorporated in 1935.

14. With consequent evaporation loss, pointed out in *American Fork Irr. Co. v. Linke*, 121 Utah 90, 239 P.2d 188 (1951), reflecting rather startling results.

by facts presented by an adversary that destroy it. The presumption in this case has been blessed here by the uninterrupted running of a grandfather's clock, so to speak. The Water Users may have attempted to interrupt it when it wrote a letter to the Engineer, which letter had no probative significance that stopped it. Rather, it was untimely at best, and struck no chord loud enough to affect the passage of time that gave status to the right to use water born of the Morse Decree.

The record here suggests the wholesome doctrine we espoused in the *Tanner* case, when we suggested that:

> In an application for change of diversion, it is not necessary for a party so applying each time to make a showing that it has beneficially used its water right.

Even if the above were not so, the plaintiffs lost their right to suggest or contest what the owner of the right to use water *had* done by way of user, *what he was required to show* before any tribunal having jurisdiction, including State Engineer and courts, or *how he should employ it* presently, by their failure to register a protest at the time and place required by controlling legislation,—as is the case here.

The defendant, Provo City, called as a witness a former employee and Superintendent in the Water Department for 36 years, starting in 1926, five years after the Morse Decree, who said that about 1930–32, he was familiar with the Morse Decree and Dixon's culinary right in the amount of 2.52 c.f.s., which Provo City commenced using on an exchange, contractual basis [15] with the Tanners; that it was used in the non-irrigation season, among other things, for stock watering purposes; that the first he heard of the Dixon Right was during the trial of the case; that there could have been more than three or four homes on the Dixon land, but not more than ten; that at that time there were "probably a hundred or a hundred fifty head of livestock on the property," or "quite a herd of cattle in there"; that the water used for livestock came in a

ditch, and was used for domestic purposes in the homes; that Provo City acquired the water right from Tanner, which was called the "Dixon right."

Plaintiffs' contention that John D. Dixon had to be using the amount of water at the time of the Decree seems to destroy the contention itself, since the Decree was entered on May 21, 1921, which was about one-third into the *irrigation* season, and not in the *non-irrigation* season, *which is the season about which plaintiffs are concerned.*

The plaintiffs, to be consistent, would have to contend that use at the *time of the Decree* contemplates a "reasonable" use that may be "on or about" the time of the Decree, even as long as four months later, and into the non-irrigation season. This position, more or less, would be consistent with what this Court is contending, that *no* proof of failure to use on the date of the decree, does *not* destroy the *right* to use. If the Morse Decree were not intended to give John D. Dixon a right to use the water four months after its date, for culinary use in the non-irrigation season,—for example, in November or December, the Decree must have been a still birth or at least an abortion of the concept of reasonable use.

We cannot believe that non-use of water on the date of the decree could deny Dixon a right of future use if his house and barn had burned down on that date and he and his cows were the victims of a careless match or the Grim Reaper in the process,— which emphasizes that the right to use is primary and depends on need and circumstance. Such right need not be daily, as is recognized in the bifurcated Morse Decree, and the right would not be lost, albeit employed daily,—but "never on Sunday." It is the *right* to use that controls over any absolute of continuity,—and each case must be viewed as the law contemplates it should, bottomed on a rule of reason. We believe such rule does not embrace a situation where there is no "proof" of use on the day of the Decree, as claimed here, but where the right has been recognized and

---

15. Change Application a–1171 was filed in 1931.

used for 46 years, buttressed by an unrebutted presumption, and reinforced not only by lack of objection, but by hard unimpeached evidence, at the time an unsupported claim is "alleged," denying such use for the untenable reason that the *objector* has no burden to prove such non-user.

As to any suggestion that Provo City's rights were adjudicated in *Tanner v. Humphreys* in 1935, or that anyone else's right was adjudicated for that matter, it appears to be without merit, since there *was* no adjudication of any rights in that case.

There was talk as to what evidence might prove, if proffered, as to rights that possibly could be asserted or damaged and to what extent, if the Application for Change in Point of Diversion were granted, based in part on whether water was diverted from tributaries or the mainstream, and considering possible damage or interference with vested rights of others. The Application, No. a–1171, subject of the *Tanner* case, was not a proceeding to adjudicate rights, nor could it have been, since the State Engineer has no power of such adjudication.

■ That there was no adjudication of any water rights is apparent upon examination of the judgment in that case, which reads as follows:

> From the above it must be concluded that the court *erred* in granting the motion for non-suit. The judgment of non-suit and dismissal is *reversed*, with *instructions* to *reinstate* the complaint and to *proceed with the trial*. If, *upon the evidence* . . . it appears that a vested right of *the power company will be impaired*, the court will deny the application.

Thus, the case had to do only with the impairment of already vested rights of the Power Company, a protestant, and the reinstatement of the theretofore rejected Application No. a–1171, to assure that there be no such impairment by the exchange and diversion of Esthma Tanner's previously established right under the Morse Decree. Even the trial court, in this case on appeal, concluded as much in its Finding No. 10, hereinbefore mentioned, to the effect that the instant action was the *first* case where a court has been called upon to fix the amount of domestic water useable during the winter season.

Counsel for respondents agreed with the trial court, and if both merely had said this action was the first case in which a court has attempted to fix the amount of domestic useable winter water *since the Morse Decree*, they both would have been accurate and the anachronism of the present confused litigation would have been resolved.

A careful examination of the text in *Tanner v. Humphreys*, including the excerpt therefrom reproduced in the dissent, clearly indicates that there is no support in that case for the pronouncement in the dissent to the effect that Provo City's rights "were adjudicated in *Tanner v. Humphreys*" and that "that ruling should be determinative of this case."

The only question here is the correctness of the State Engineer's first decision under Application for Change in Point of Diversion No. a–460, February 9, 1966, authorizing a diversion of the full 2.52 cubic feet per second of water at a new place of delivery, which incidently involves the correctness of the judgment of the trial court.

For the reasons stated, the judgment of the lower court is reversed. We further hold that insofar as the respective claims of the parties hereto are concerned, the right to use the water involved in this case, in the amount awarded in the Morse Decree, to-wit, 2.52 cubic feet per second, during the non-irrigation season as spelled out therein, belongs to the defendant, Provo City, by mesne conveyance, and that the State Engineer's Change Order No. a–460, as amended, having to do with the distribution of 1.26 cubic feet of water to Provo City, is of no force and effect, but that the original Order of the State Engineer under No. a–460 is valid; that this case is remanded with instructions to vacate the judgment heretofore entered by the trial court and to enter judgment in accordance with the pronouncements herein made.

Because of the nature, novelty, public concern, number of interests involved and the good faith pursuant to this litigation by all parties and counsel, no costs are awarded, each party to bear its own.

HALL, C. J., concurs.

MAUGHAN, J., did not participate herein; HENRIOD, Retired Justice, sat.

CROCKETT, Retired Justice, acted on this case prior to his retirement.

CROCKETT, Retired Justice (concurring with comments):

I concur with the main opinion; and I add some comments about matters which impress me as supporting its conclusion.

There are certain basic propositions to be kept in mind. The first is that the resolution of the dispute over the 2.52 cfs of water is to be found in the language of the Morse Decree. The second is that the water right dealt with in the Decree can be divided into two classifications; i.e., water used for culinary, domestic, and other purposes; and water used for irrigation. It is to be noted that paragraph No. 28 relied upon by the defendant is in effect a specific and unrestricted grant among the many individual grants in the Decree, while paragraph No. 124 relied upon by the plaintiff, is a generality intended to deal primarily with irrigation water.

If paragraph 28 is scrutinized carefully, it is seen as an adjudication (in effect a grant) of an unlimited year-around right to 2.52 cfs of water from the Provo River to defendants' predecessor John D. Dixon. This is so because that paragraph plainly and simply adjudicates the right to that amount of water. It contains no characterization of the water thus granted as irrigation water, neither does it place any limitation upon its use. The pertinent part of that paragraph is underscored:

JOHN D. DIXON. From January 1st to December 31st.

As successor in interest to J. H. Snyder, Joshua J. Mecham, John W. Hoover, and Hyrum Heiselt to <u>2.80 second feet of</u> <u>water</u> which was appropriated upon lands in Provo Canyon, the place of use and the point of diversion having been changed and the said water is now being used upon lands below the mouth of Provo Canyon, and the point of diversion from Provo River is now at and near the mouth of Provo Canyon, Utah County, Utah, and <u>said use may be continued and the quantity to which the said defendant is entitled</u> at his said point of diversion, at and near the mouth of Provo Canyon, <u>is 2.52 second feet</u>; . . .

The part of the Morse Decree relied upon by plaintiff, and which has been urged as casting doubt as to the effect of paragraph 28 as has been stated above, is found 96 paragraphs further on, in paragraph 124. The pertinent parts are underscored:

<u>That all rights declared and decreed herein, for domestic and municipal uses</u> and for the generation of power, <u>are continuous throughout the year without limitation to time or season.</u>

<u>And that all the rights</u> declared and decreed herein, <u>for irrigation purposes, include the right to divert and use water for irrigation, culinary, domestic and agricultural purposes</u> connected therewith. And such rights of diversion and use for culinary, and domestic purposes are continuous throughout the year, and are limited to the quantity reasonably necessary for said uses. <u>And such rights of diversion and use for irrigation purposes is confined to the irrigation season</u> of each year, and none of said parties shall divert or use any of said waters, (except for culinary and domestic purposes as hereinbefore provided), during the non-irrigating season—after the necessity for such use for irrigation purposes has ceased in the Autumn of each year and until it is necessary to use the same for irrigation purposes in the Spring of the year following.

It will be noted that the substance of the first paragraph of paragraph 124 just quoted is that all water rights for uses other than irrigation are continuous throughout the year; and that the remaining portion

thereof is dealing with water used for irrigation purposes. Though it is true that the second sentence of the latter paragraph states that waters used for culinary and domestic purposes are limited to the quantity reasonably necessary for those uses, the fair and reasonable import of the entire paragraph is that the restriction it states in confining the use of irrigation water to the irrigation season is intended to affect only irrigation water; and there is no basis therein for concluding that it was intended to restrict the right to use the water granted in paragraph 28, neither to reduce the amount, 2.52 cfs, permitted to be used, nor as to the time of year. Consequently, because the right decreed in paragraph 28 is neither restricted nor designated as being "for irrigation purposes" the limitations upon irrigation water as stated in paragraph 124 should not deprive defendants (predecessors) of the right to use up to the 2.52 cfs granted in paragraph 28.

What has been said above would seem to be sufficient to settle the controversy. But, if it is thought necessary to further fortify the soundness of the Court's decision, there are two rules of construction which also tend to do so. The first is that if there is inconsistency, uncertainty or overlapping in the provisions of a document, language which deals more specifically with a subject matter takes precedence over general language. Thus, the express grant of water in paragraph 28, without limitation thereon, should take precedence over the general statement and the limitation on irrigation water stated in paragraph 124.

Even more important here is the rule that if there is inconsistency or doubt about the language used in a document, the practical construction placed on it, as shown by the actions of the parties, should be given consideration, and may be regarded as persuasive. The right awarded to John D. Dixon appears to have been honored on a year-round basis from the time of the Morse Decree in 1921 for a period of 46 years, until March 8, 1967, when the plaintiff first protested the defendant's right to the use of the water.

When what has been said above is considered together with the sound proposi-

tions set forth in the main opinion: that once the ownership of water is shown (in defendant here) the burden is upon the attacker (plaintiff here), it seems sufficiently persuasive to me that the ownership and use of the 2.52 cfs feet of water as has been owned and used by Provo City for these many years should remain undisturbed.

HOWE, Justice (concurring in the result):

I concur in the result.

As Justice Crockett points out in his opinion, it is not clear that § 28 of the Morse Decree made the Dixon right an irrigation right. It is not so designated and there is no language in § 28 to indicate that the 2.52 c.f.s. of water was to be used for irrigating lands. It is interesting to compare the wording of § 28 with the preceding § 27 where in many instances the water decreed is specified to be used for the irrigation of a certain number of acres of land. No such reference appears in § 28. It is neither specified that it is for irrigation purposes nor are the lands upon which the water is to be applied identified.

This Court in *Tanner v. Humphreys,* 87 Utah 164, 48 P.2d 484 (1935) treated the Dixon right as an irrigation right as had the State Engineer and the district court, but whether it was or was not such a right was not an issue in that case. However, if we concede that the Dixon right was an irrigation right and that § 124 must be read in connection with § 28, then it becomes necessary to analyze § 124. Respondents base their argument on the contents of the fourth paragraph which contains five sentences. Those sentences may be summarized as follows:

1. The right to divert and use water for irrigation purposes is confined to the irrigation season and no one shall divert or use water after the irrigation season, except for culinary and domestic use.

2. Included in an irrigation right is the right to divert and use water for irrigation, culinary, domestic and agriculture purposes connected therewith.

3. Such right of diversion and use for culinary and domestic purposes are continuous throughout the year, but limited as to

the quantity reasonably necessary for such uses.

4. The River Commissioner shall enforce the provisions of this paragraph, particularly with respect to the quantity of water diverted during non-irrigation season whenever such diversion will interfere with the use of water by parties who have been awarded water for the generation of power.

5. If the Commissioner imposes rules and regulations which aggrieve any user, he, his heirs, executors, administrators, successors and assigns may apply to the court and the court will review the Commissioner's actions and give an order of direction.

There is nothing in § 124 which directs, contemplates or even suggests, that any user would ever have to return to court to prove the quantity of culinary or domestic water he was entitled to use. Nor is there any hint in the language of § 124 that a user would always be limited to that quantity of culinary water he was using on the date the Morse Decree was entered. We did not fix that date or any other date as a base date in *Tanner v. Humphreys*, supra. Since one of the objections to the change application requested in that case was that the use would be enlarged, this Court stated that it might be "necessary for the [trial] court to take evidence on the question of what amount of water would be reasonably required during the non-irrigable season for culinary and domestic purposes, and so condition the decree as to permit only that amount to be taken from the tributaries during such non-irrigation season." The implication in that language is that the base for measuring any increase in use would be the current year, not the May 1921 use. Thus I conclude that while the user is limited to such quantity as is reasonable for his needs on his premises, that amount could well differ from month-to-month and year-to-year as people moved on and off the premises, and as the number of head of livestock kept there changed. The amount could not, of course, exceed 2.52 c.f.s. which was granted.

The language of § 124 contemplates that a user return to court only if the commissioner imposed some restriction on his use, with which the owner disagreed and he desired the court to review it. Nothing in § 124, or in any other part of the decree, directed or contemplated that the hundreds of users on the river would have to return to court some day to prove their actual use of culinary water in May 1921. I refer to § 134 of the decree which provided that the court would retain jurisdiction for the following purposes: (a) to make corrections for clerical errors, but only for 60 days; (b) to determine and fix the quantity of losses by evaporation and seepage; (c) to determine and fix payments and assessments to be borne by the parties; (d) to appoint commissioners and fix their compensation. Then it was stated, "In all other respects the decree shall be final."

Thus I conclude that the main purpose of § 124 was to prevent the wasting of water and to ensure that there was always enough flow in the river to satisfy power generation needs.

It follows from what I have said that the trial court's determination that the burden rested with Provo City and Hamblin to prove their May 1921 culinary use was erroneous. Their culinary use at that time does not forever fix their right. In view of that fact, it was also erroneous because, as pointed out in the main opinion, nowhere in the water jurisprudence of this state does the owner of a water right bear the burden of being able at all times to prove that he is using all the water which has been decreed to him. The burden has always been on the person who claims that an owner of a water right was not beneficially using all his water to establish that fact. There is nothing in our opinion in *Tanner v. Humphreys*, supra, which dictates otherwise. It did not hold that the user would have to return to court and bear the burden of proving his May 1921 culinary use. It simply held that when an application is filed to permit a change in the point of diversion and nature of use, the applicant must make a prima facie showing that the required change will not impair vested rights of others. But the opinion recognized that this involved proving a negative and stated, "It would be impractical to require the plaintiff to ferret out all of the ways in which the others

might perchance be injured, and offer proof in negation thereof as a part of its affirmative case. The general negative as against injury to the protestants is sufficient to carry the case over a motion for a nonsuit in that respect."

CROCKETT, J., Retired, concurs in the opinion of HOWE, J.

STEWART, Justice (dissenting):

I would affirm the decision of the trial court.

Provo City's predecessor in interest, Esthma Tanner, had the right to 2.52 cfs of water during the irrigation season (May to October) and the right to use the amount of water necessary for domestic and culinary purposes during the rest of the year. Contrary to the majority opinion, the rights of Provo City were adjudicated in *Tanner v. Humphreys*, 87 Utah 164, 48 P.2d 484 (1935); that ruling should be determinative in this case. This Court in *Tanner* construed the Morse Decree and expressly held that Esthma Tanner, who had succeeded to the so-called Dixon right under the Morse Decree, had the right to 2.52 cfs of water during the irrigation season only. The Court's holding today that Tanner owned that right for the entire year is not reconcilable with the adjudication in *Tanner*.

The Court further held in *Tanner* that Esthma Tanner had the burden under the decree of proving the amount that was "reasonably required for domestic and culinary purposes" during the nonirrigation season. In *Tanner*, the Court stated:

> We believe that the [trial] court and the respondent [Esthma Tanner] are both correct in their interpretation of the decree that by paragraph 124 of the said decree the plaintiff was only entitled to water up to 2.52 second feet for irrigation purposes and in the nonirrigation season only so much thereof as was reasonably required for domestic and culinary purposes on the premises where the irrigation water was used. But this matter could also have been taken care of in the decree. It might have been necessary for the court to take evidence on the question of what amount of water would be reasonably required during the nonirrigable season for culinary and domestic purposes, and so condition the decree as to permit only that amount to be taken from the tributaries during such nonirrigation season. We think that all that the plaintiff asked and all that she could get was an exchange of the waters which she had under her right, but that as far as the complaint and evidence were concerned up to the point of the motion for a nonsuit, she was entitled to a decree giving her that right, the court to supplement with a hearing on the amount reasonably necessary for domestic purposes. Thus interpreted, it disposes of the contention that the plaintiff was in effect seeking to appropriate additional water. [48 P.2d at 488.]

Insofar as the record discloses, neither Esthma Tanner nor her successors, including Provo City, has ever established the amount of water to which Tanner was entitled during the nonirrigation season.